JUDGE BUCHWALD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CENTER FOR CONSTITUTIONAL RIGHTS, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | DOCKET NO:_____ |
| v. | ) | |
| | ) | COMPLAINT FOR |
| DEPARTMENT OF DEFENSE AND ITS | ) | INJUNCTIVE RELIEF |
| COMPONENTS DEFENSE INTELLIGENCE | ) | |
| AGENCY AND UNITED STATES SOUTHERN | ) | |
| COMMAND; DEPARTMENT OF JUSTICE | ) | |
| AND ITS COMPONENTS FEDERAL BUREAU | ) | |
| OF INVESTIGATION AND EXECUTIVE | ) | |
| OFFICE OF UNITED STATES ATTORNEYS; | ) | |
| AND CENTRAL INTELLIGENCE AGENCY, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

RECEIVED
JAN 09 2012
U.S.D.C. S.D. N.Y.
CASHIERS

PRELIMINARY STATEMENT

1.  This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C § 553 *et seq.*, for injunctive and other appropriate relief, seeking the immediate processing and release of agency records requested by plaintiff from defendants Department of Defense ("DOD") and its components Defense Intelligence Agency ("DIA") and United States Southern Command ("SouthCom"); Department of Justice ("DOJ") and its components, the Federal Bureau of Investigation ("FBI") and Executive Office of United States Attorneys ("EOUSA"); and Central Intelligence Agency ("CIA"). It is brought by the Center for Constitutional Rights ("CCR"), which represents Mohammed al Qahtani (Mr. al Qahtani) (Interment Serial Number 063), a detainee in the U.S. detention camps at Guantánamo Bay, Cuba.

2.  From 2002 to 2003, while he was detained at Guantánamo, Mr. al Qahtani was subjected to systematic twenty-hour interrogations, prolonged sleep deprivation, forced nudity,

sexual and religious humiliation, and other interrogation tactics that were both uniquely harsh and approved at the highest levels, and which caused Mr. al Qahtani severe physical and psychological trauma. On January 14, 2009, Military Commission Convening Authority Susan Crawford conceded that these acts amounted to torture, and determined that as a consequence, Mr. al Qahtani could not be subjected to prosecution before a military commission. Mr. al Qahtani remains the only detainee at Guantánamo whom the Government has directly acknowledged having tortured.

3. The Center for Constitutional Rights here seeks disclosure of videotapes and photographs relating to Mr. al Qahtani's detention, the existence of which was disclosed by the government in 2009. Although some written records relating to the interrogation of Mr. al Qahtani have been publicly disclosed, the public has never seen any images relating to Mr. al Qahtani's treatment in Guantánamo. The videotapes and photographs here sought are therefore uniquely significant, and will provide the public with critical information regarding the Government's interrogation policies as implemented at the detention facility at Guantánamo and perhaps elsewhere – at least some of which may still be in use pursuant to Appendix M of the Army Field Manual.

4. Mr. al Qahtani's treatment has been the subject of public debate and congressional inquiries, as well as internal agency investigations. The American public should now be permitted to see what occurred for itself.

<u>JURISDICTION AND VENUE</u>

5. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C §§ 552(a)(4)(B) and 552(a)(6)(E)(iii). The Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 5 U.S.C §§ 701 - 706. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

6.    Plaintiff CCR is a New York-based legal and public education not-for-profit organization that engages in litigation, legal research, and the production of publications in the fields of civil and international human rights, including extensive materials on individuals apprehended and detained after September 11, 2001. CCR publishes regular newsletters, know-your-rights handbooks, and other informational materials for public dissemination. These materials are also available through CCR's Education and Outreach Department. Additionally, CCR operates a website, ccrjustice.org, which addresses issues on which CCR works and which makes materials on topical civil and human rights issues freely available to the public.

7.    Defendant DOD is a Department of the Executive branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f)(1). Defendants DIA and SouthCom are components of DOD.

8.    Defendant DOJ is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. §552(f)(1). Defendants FBI and EOUSA are components of DOJ.

9.    Defendant CIA is a Department of the Executive Branch of the United States Government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

## FACTS

**I. BETWEEN 2002 AND 2003, MR. AL QAHTANI WAS SUBJECTED TO TORTURE AND OTHER CRUEL, INHUMAN, AND DEGRADING TREATMENT AT THE HANDS OF U.S. GOVERNMENT AGENTS.**

10.    From 2002 through 2003, Mr. al Qahtani was the victim of a deliberate and calculated interrogation strategy involving the repeated use of torture and other profoundly cruel, inhuman, and degrading treatment. The tactics employed by his interrogators have been

documented in a leaked log of his interrogations, which was published in Time Magazine in 2005, and in other government records disclosed through FOIA litigation. *See Inside the Interrogation of Detainee 063*, Time, June 20, 2005, *available at* http://www.time.com/time/magazine/article/0,9171,1071284,00.html. Mr. al Qahtani remains the only individual at Guantánamo whom a U.S. official has directly stated was tortured.

11. Mr. al Qahtani was held in conditions of extreme isolation and interrogated by FBI agents and military personnel at Guantánamo from August 2002 though November 2002. Office of Inspector Gen., U.S. Dep't of Justice, *A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq* 80-90 (2009) [hereinafter DOJ-OIG], *available at* http://www.justice.gov/oig/special/s0910.pdf. As a result of this treatment, an FBI Deputy Director reported that he observed Mr. al Qahtani exhibiting symptoms of "extreme psychological trauma" in November 2002. *See* Letter from T.J. Harrington, Deputy Assistant Director, Counterterrorism Division, FBI, to Major General Donald R. Ryder, Criminal Investigation Command, Department of the Army (2006) (regarding "Suspected Mistreatment of Detainees"), *available at* http://ccrjustice.org/files/TJ%20Harrington%20Ltr%20 Redacted%207%2014%2004.pdf. The FBI observed that, during this time, Mr. al Qahtani was "talking to non-existent people, reporting hearing voices, [and] crouching in a corner of the cell covered with a sheet for hours on end." *Id.*

12. In November 2002, when Mr. al Qahtani was already mentally and physically broken, military interrogators implemented the first "Special Interrogation Plan," a regime of harsh interrogation techniques approved by military and White House officials, and designed by military and CIA personnel. Staff of S. Armed Serv. Comm., *Inquiry into the Treatment of Detainees in U.S. Custody* 74-78 (2008) [hereinafter *Inquiry into the Treatment of Detainees*],

*available at* http://graphics8.nytimes.com/packages/images/nytint/docs/report-by-the-senate-armed-services-committee-on-detainee-treatment/original.pdf. The FBI objected to this plan based on concerns regarding "efficacy, coercion, and possible illegality." DOJ-OIG 90. U.S. officials subjected Mr. al Qahtani to the First Special Interrogation Plan for 54 days (between November 23, 2002 and January 16, 2003). *Inquiry into the Treatment of Detainees* 88.

13. Mr. al Qahtani's treatment consisted of daily 20-hour interrogation periods, along with severe sleep deprivation and isolation. United States military personnel flooded Mr. al Qahtani's cell with light and loud music and/or sound during his brief periods of rest. He was isolated from other prisoners and deprived of sensory stimulation under a harsh regime of solitary confinement, *id.* at 82, and "made [to] believe he was sent to a hostile country which advocated torture," *id.* at 88 (internal citation omitted). During interrogation periods, when Mr. al Qahtani began to fall asleep from exhaustion, interrogators would force him to stand or pour water on him. *See* Interrogation Log of Detainee 063, Nov. 24, 2002 at 0550, 0840; Nov. 26, 2002 at 0440; Dec. 14, 2002 at 0025 [hereinafter Interrogation Log], *available at* http://ccrjustice.org/files/Al%20Qahtani%20Interrogation%20Log.pdf. This sleep deprivation, combined with other torturous acts during his interrogations, led to visual and auditory hallucinations. Mr. al Qahtani urinated on himself multiple times and broke down into tears. *See, e.g.*, Interrogation Log, Nov. 25, 2002 at 1115; Dec. 10, 2002 at 2230; Dec. 28, 2002 at 1300; Letter from T.J. Harrington, *supra*.

14. In addition, Mr. al Qahtani was subjected to religious, sexual, and moral humiliation. Interrogators forced Mr. al Qahtani to appear in the nude, sometimes for prolonged periods of time, and forced him into stress positions. Female interrogators straddled Mr. al Qahtani and molested him while other military guards pinned his body to the floor. Declaration of Gitanjali

S. Gutierrez, Esq., Lawyer for Mohammed al Qahtani 6 [hereinafter Gutierrez Declaration], *available at* http://ccrjustice.org/files/Publication_DeclarationonAlQahtani.pdf. Mr. al Qahtani was also made to do tricks while wearing a dog collar, along with other attempts at humiliation. *See Inquiry Into the Treatment of Detainees* 136.

15. There is also evidence that U.S. officials used Mr. al Qahtani's harsh interrogation plan in part as a psychological experiment. Responding to a question by Senator Carl Levin about the use of the term "America's 'Battle Lab'" to describe Guantánamo, Colonel Britt Mallow acknowledged that high-ranking U.S. officials had referred to Guantánamo as a "'Battle Lab[,]' meaning that interrogations and other procedures were to some degree experimental, and that their lessons would benefit DOD in other places." *Inquiry Into the Treatment of Detainees* 43. Colonel Mallow stated that he "personally objected to the implied philosophy that interrogators should experiment with untested methods, particularly those in which they were not trained." *Id.* Indeed, the interrogation log provides great detail as to Mr. al Qahtani's emotional and psychological reactions to the interrogation techniques and little or none as to information that the interrogators were allegedly trying to extract.

16. As a result of Mr. al Qahtani's harsh treatment, Mr. al Qahtani suffered severe physical and psychological injury. For example, Mr. al Qahtani's weight fell from approximately 160 pounds to 100 pounds. Gutierrez Declaration 9.

17. Mr. al Qahtani was also hospitalized at least twice after coming close to death during interrogations at Guantánamo. On December 7, 2002, the interrogation log notes that Mr. al Qahtani was rushed to the military base hospital when his heart rate fell dangerously low after enduring a period of extreme sleep deprivation, physical stress, and psychological trauma. Interrogation Log, Dec. 7, 2002 at 2130. During his transportation from the hospital back to his

cell, he was interrogated in the ambulance. Interrogation Log, Dec. 7, 2002 at 1800. In another instance, Mr. al Qahtani was subjected to extremely cold temperatures for prolonged periods of time, causing him to be hospitalized for hypothermia. Office of Inspector Gen., *supra*, at 103.

18. Military Commission Convening Authority Susan Crawford admitted in January 2009 that the United States's treatment of Mr. al Qahtani amounted to torture. Bob Woodward, *Detainee Tortured, Says Official Overseeing Military Trials*, Wash. Post, Jan. 14, 2009 ("We tortured [Mohammed al] Qahtani. . . . His treatment met the legal definition of torture."), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/01/13/AR20090113 03372.html. Yet at least some interrogation techniques utilized on Mr. al Qahtani that constitute torture or other cruel, inhuman and degrading treatment may still be in use pursuant to Appendix M of the Army Field Manual, which authorizes the use of isolation, sleep deprivation and sensory deprivation in interrogations of "enemy combatants." *See* Amnesty International, *The Army Field Manual: Sanctioning Cruelty?*, Mar. 19, 2009, *available at* http://www.amnesty.org.au/hrs/comments/20575/.

## II. PLAINTIFF'S MARCH 2010 FOIA REQUESTS

19. On March 4, 2010, plaintiff submitted FOIA requests to defendants CIA; DOD and its components DIA and SouthCom; and DOJ and its component FBI. DOJ forwarded plaintiff's request to its components EOUSA and the National Security Division ("NSD"). NSD forwarded plaintiff's request to DOD.

20. On September 15, 2010, plaintiff submitted an identical FOIA request to the FBI.

21. Plaintiff's FOIA requests sought three types of records. First, plaintiff sought videotapes of Mr. al Qahtani made from February 13, 2002 through November 30, 2005. Second, plaintiff sought photographs of Mr. al Qahtani taken from February 13, 2002 through

November 30, 2005. Third, plaintiff sought any other audio or visual recordings of Mr. al Qahtani made from February 13, 2002 through November 30, 2005. All of the records sought pertained to the period during which Mr. al Qahtani was in U.S. custody in Guantánamo.

22. In conjunction with these FOIA requests, plaintiff applied for expedited processing based on the fact that CCR is an organization that primarily engages in disseminating information, and that the information is relevant to a subject of public urgency concerning an actual or alleged Federal government activity. 5 U.S.C 552(a)(6)(E)(i); *see also* 32 C.F.R § 1900.34(c)(2) (CIA); 32 C.F.R § 286.4(d)(3)(ii) (DOD); 28 C.F.R § 16.5(d) (DOJ).

23. In addition, plaintiff made a fee waiver request as a "representative[] of the news media" on the grounds that disclosure of the requested public records is in the public interest and that disclosure "is likely to contribute significantly to the public understanding of activities or operations of the government" and "is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

24. Alternatively, plaintiff sought a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by . . . a representative of the news media") and 32 C.F.R § 1900.13(i) (limiting processing fees for representatives of the news media) (CIA), 32 C.F.R. § 286.28(e)(7) (same) (DOD), and 28 C.F.R. § 16.11(d) (same) (DOJ).

CIA

25. The CIA denied plaintiff's FOIA request in a letter dated March 24, 2010. The CIA issued a *Glomar* response that stated the CIA could "neither confirm nor deny the existence or nonexistence" of the requested material (Exec. Order No. 12,958). *See Phillippi v. CIA*, 546

F.2d 1009 (D.C. Cir. 1976); *see also Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989). The CIA also stated that the existence or nonexistence of the requested records is classified and is "intelligence sources and methods information" pursuant to section 6 of the Central Intelligence Agency Act of 1949, and is therefore exempt from FOIA pursuant to 5 U.S.C. § 552(b)(1) and 5 U.S.C. § 552(b)(3).

26. Plaintiff appealed the CIA's denials in a letter dated May 26, 2010. Plaintiff argued that the CIA's invocation of a *Glomar* response (refusing to confirm or deny the existence of records) was inappropriate, since the CIA's involvement with Mr. al Qahtani's torture was publicly known, *see, e.g.*, *Inquiry into the Treatment of Detainees*, *supra*, as was the fact that videotapes were made of Mr. al Qahtani while he was in U.S. custody. *See* Order, *al Qahtani v. Obama*, No. 05-1971 (D.D.C) (filed Oct. 5, 2009) (ordering production of videotapes made of Mr. al Qahtani while he was in U.S. custody in November 2002).

27. Plaintiff also argued that the CIA could not rely upon FOIA exemption (b)(1) or (b)(3). Specifically, Plaintiff pointed out that the agency could not classify information and invoke national security exemptions in order to "conceal violations of law," to "prevent embarrassment to a person, organization or agency," or to "prevent or delay the release of information that does not require protection in the interest of national security." *See* Exec. Order 12,958, as amended, § 1.7(a). Plaintiff also restated its previous arguments in support of a fee waiver and expedited processing.

28. In a letter dated June 15, 2010, the CIA acknowledged receipt of the appeal and notified plaintiff that the appeal would be referred to the appropriate members of the Agency Release Panel. The CIA stated that it would advise plaintiff of its determination but that it was unlikely that the agency would respond within 20 statutory working days.

29. The CIA did not issue a final decision within the applicable time limits for deciding the plaintiff's appeal, nor has any decision been issued to date. *See* 5 U.S.C. § 552(a)(6)(C)(i) (administrative remedies shall be deemed exhausted if the agency "fails to comply with the applicable time limit provisions").

DOD

30. On March 19, 2010, DOD acknowledged receipt of plaintiff's FOIA request, fee waiver request, and request for expedited processing. DOD stated that it was aware that plaintiff had already sent a duplicate request to SouthCom and that the offices would coordinate with each other concerning a search at Joint Task Force Guantánamo ("JTF-GTMO"). In addition, DOD stated that it would ask the Defense Criminal Investigation Task Force to search for responsive records.

31. In the same letter, DOD argued that plaintiff was not a representative of the news media and would not qualify for a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) or 32 C.F.R. § 286.28(e)(7). DOD placed the plaintiff in the "other" fee category (2 hours and 100 pages duplicated free and subsequent processing at DOD's standard fee). With respect to plaintiff's request for a fee waiver, DOD stated that a decision would be made after the search was conducted, and asked for a fee commitment beyond the 2 free hours provided for in the "other" category.

32. As to the request for expedited processing, DOD averred that plaintiff failed to demonstrate that the value of the information would be lost if the information was not disseminated quickly. DOD determined that the request for expedited processing did not meet the criteria of 32 C.F.R. § 286.4(d)(3)(iv), and stated that this denial also applied to plaintiff's FOIA request to SouthCom.

33. By letter dated September 3, 2010, plaintiff informed DOD that it could not commit the fees necessary for a full search, and argued that a fee waiver was warranted. DOD responded by letter dated September 14, 2010, acknowledging receipt of the letter and stating it could not respond within 20 days. By letter dated December 3, 2010, DOD stated that it would not consider the plaintiff's letter because it was filed outside DOD's 60-day time limit for appeals.

34. By letter dated November 29, 2010, DOD responded to plaintiff's March 4, 2010 request for documents and a fee waiver. The letter stated that JTF-GTMO found 47 photos and one video recording that were responsive to the FOIA request, of which 13 were within the record system of the Defense Criminal Investigation Task Force.

35. DOD stated that Captain S.B. Campbell, the Initial Denial Authority for JTF-GTMO, found that the 47 photos were exempt from release in full pursuant to 5 U.S.C. § 552(b)(1), which pertains to information that is "currently and properly classified" pursuant to Executive Order 13,526; Section 1.4(a), which pertains to information involving military plans, weapons, or operations; and Section 1.4(c), which pertains to intelligence activities (including covert actions), intelligence sources or methods, or cryptology.

36. DOD also stated that the videotape was exempt from release under 5 U.S.C. § 552(b)(2), as a matter that pertains solely to the internal rules and practices of the agency. The agency also stated that the videotape was exempt from release pursuant to 5 U.S.C. § 552(b)(3) because it pertains to personnel in overseas, sensitive, or routinely deployable units under 10 U.S.C. § 130b; and under 5 U.S.C. 552(b)(6) because its release would constitute a clearly unwarranted invasion of personal privacy.

37. DOD also stated that plaintiff's fee waiver request was moot because no fees were required to be paid for this response.

38.  By letter dated January 18, 2011, plaintiff appealed DOD's November 29, 2010 denial of its requests for records and expedited processing.  Plaintiff argued that DOD had failed to establish that releasing the requested records would present a serious risk of circumventing agency regulations, statutes, or other legal requirements as required under 5 U.S.C. § 552(b)(2). Plaintiff also argued that FOIA exemptions (b)(1), (b)(2), and (b)(3) were inapplicable because Executive Order 12958 § 1.7(a)(1) bars the government from classifying information and invoking national security exemptions for the purpose of concealing illegal conduct.

39.  Plaintiff further argued that FOIA exemption (b)(6) was inapplicable because there was no basis to conclude that the requested records would cause an unwarranted invasion of privacy, and that even if the documents raised a slight privacy interest, the public's substantial interest in their release outweighed this interest.  Plaintiff argued that the DOD's reliance on the statutory exemption in 10 U.S.C.§ 130b was also inappropriate, because DOD offered no basis for its conclusion that release of the records would reveal the identity of members of the armed forces, and that if they did, they could be altered to blur faces and other identifying information.

40.  Finally, plaintiff argued that if DOD could not release the whole of the documents, redacted documents should be released pursuant to 5 U.S.C. § 552(b).

41.  By letter dated February 10, 2011, DOD acknowledged receipt of plaintiff's appeal. DOD stated that plaintiff's request for expedited processing was moot because CCR received a response to its request.  With respect to CCR's appeal regarding the denied records, DOD stated that it would process the appeal, but that due to a heavy workload, it would be unable to complete the appeal within the statutory time period.

42.  DOD did not issue a final decision within the applicable time limits for deciding plaintiff's appeal, nor has any decision been issued to date.  *See* 5 U.S.C. § 552(a)(6)(C)(i).

## DIA

43. In a letter dated March 16, 2010, DIA acknowledged receipt of plaintiff's FOIA request. DIA denied plaintiff's request for expedited processing, concluding that plaintiff had not demonstrated a "compelling need" pursuant to Section C1.5.4.3 of DOD FOIA Regulation 5400.7-R. DIA stated that plaintiff's request would be processed in the order in which it was received.

44. In a letter dated October 13, 2010, DIA provided a status update on plaintiff's FOIA request, stating that it was in DIA's "awaiting tasking queue." In a letter dated October 26, 2011, DIA provided a second status update, stating that Plaintiff's request was in DIA's "awaiting response queue."

45. DIA did not respond to plaintiff's FOIA request within the statutory time period, nor has any response been issued to date. *See* 5 U.S.C. § 552(a)(6)(C)(i).

## SouthCom

46. By letter dated March 19, 2010, DOD denied plaintiff's FOIA request for expedited processing on behalf of SouthCom.

47. SouthCom did not respond to plaintiff's FOIA request within the statutory time period, nor has any response been issued to date. *See* 5 U.S.C. § 552(a)(6)(C)(i).

## DOJ

48. By letter dated March 19, 2010, DOJ acknowledged receipt of plaintiff's request and notified plaintiff that it had referred the FOIA request to three components: FBI, EOUSA, and NSD. DOJ also informed plaintiff that any further inquiries should be sent to these components. Each component replied to the request.

## FBI

49. In a letter dated March 24, 2010, the FBI acknowledged receipt of plaintiff's March 4, 2010 FOIA request, stated that the request was being processed, and denied plaintiff's request for expedited processing and a fee waiver.

50. In a letter dated June 16, 2010, the FBI issued its final response denying plaintiff's FOIA request, claiming that the records were exempt under 5 U.S.C. § 552(b)(7)(A). Plaintiff appealed the denial in a letter sent to the Office of Policy Information ("OPI"), dated August 16, 2010, but due to the timing of the letter, the FBI did not treat the letter as an appeal and closed its appeal file.

51. By letter dated September 15, 2010, plaintiff resubmitted its FOIA request to the FBI.

52. The FBI responded to the September 15, 2010 request in a letter dated September 30, 2010. The FBI denied plaintiff's request pursuant to 5 U.S.C. § 552(b)(7)(A), arguing that the requested records "could reasonably be expected to interfere with enforcement proceedings."

53. On October 26, 2010, plaintiff appealed the FBI's September 15, 2010 denial of its request for responsive records, expedited processing, and a fee waiver. Plaintiff argued that the records were not part of the 7(A) exemption because the FBI's "blanket assertions fail to demonstrate that disclosure of the records would interfere with law enforcement proceedings."

54. Plaintiff also argued that it met the criteria for a fee waiver pursuant 5 U.S.C. § 552(a)(4)(A)(iii) and that the records "would contribute significantly to the public understanding of governmental operations or activities." Plaintiff stated that if it is not eligible for a fee waiver, it should be entitled to a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II).

55. By letter dated November 4, 2010, the FBI acknowledged receipt of the appeal, and stated that it would notify the plaintiff of its decision on the appeal "as soon as we can."

56. The FBI did not issue a final decision within the applicable time limits for deciding plaintiff's appeal, nor has any decision been issued to date. *See* 5 U.S.C. § 552(a)(6)(C)(i).

EOUSA

57. By letter dated April 15, 2010, EOUSA responded to plaintiff's FOIA request. EOUSA stated that releasing the requested records would be an unwarranted invasion of personal privacy because plaintiff had not furnished a release, death certificate, or public justification for the release. EOUSA also stated that the records requested were generally exempt from disclosure pursuant to 5 U.S.C. § 552(b)(6) and 5 U.S.C. § 552(b)(7)(C).

58. In a letter dated July 8, 2010, plaintiff appealed EOUSA's denial of its FOIA request. Plaintiff argued that the requested records did not implicate Mr. al Qahtani's privacy interests because his treatment and suffering had already been widely reported, that the records were of great public importance, and that EOUSA failed to balance the public interest against any privacy interests implicated by the disclosure.

59. Furthermore, plaintiff challenged EOUSA's claim that the information was exempt from disclosure under FOIA exemptions (b)(6) and (b)(7)(c), because EOUSA had not established that the requested records constitute "information compiled for law enforcement purposes" or that releasing the requested records would constitute an "unwarranted invasion of personal privacy."

60. In a letter dated July 28, 2010, EOUSA acknowledged receipt of plaintiff's appeal, and stated that it would provide its decision "as soon as we can."

61.  EOUSA did not issue a final decision within the applicable time limits for deciding plaintiff's appeal, nor has any decision been issued to date.  *See* 5 U.S.C. § 552(a)(6)(C)(i).

NSD

62.  By letter dated April 13, 2010, NSD acknowledged receipt of plaintiff's FOIA request, but NSD stated that it does not handle the requested records.  It therefore referred plaintiff's request to the DOD and administratively closed plaintiff's file.

## III. RELEASING VIDEOTAPES AND PHOTOGRAPHS OF MR. AL QAHTANI'S INTERROGATIONS WILL SERVE THE PUBLIC INTEREST.

63.  Releasing the videotapes and photographs of Mr. al Qahtani's interrogations will serve the public interest, by providing the American public with unique documentation of the systematic abuses at Guantánamo.

64.  Both the media and the general public have clamored for information regarding the treatment and conditions of persons detained at Guantánamo.  A brief survey of online sources reveals some 10,000 news articles, editorials, and opinion pieces since 2003 relating to interrogations and treatment of Guantánamo detainees, over 400 books relating to topics of detention and national security, and countless blog posts and online comments.  One of the consistent themes expressed in these publications is the desire for more transparency and information relating to the conduct of interrogators and the treatment of detainees.  *See, e.g.,* John Goetz et al., *A View Deep Inside Guantanamo*, Spiegel Online, Apr. 25, 2011, http://www.spiegel.de/international/world/0,1518,758916,00.html; Jeremy W. Peters, *Tour of Guantánamo Offers a Look, But Little Else*, N.Y. Times, Aug. 11, 2010; William Maclean, *Lawyer Urges U.S. and UK to End Guantanamo Secrecy*, Reuters UK, Feb. 6, 2009, http://uk.reuters.com/article/2009/02/06/us-guantanamo-lawyer-sb-idUKTRE5153I420090206;

Mahvish Khan, *My Guantanamo Diary: The Detainees and the Stories They Told Me* xi (2009); James Rowley, *Guantanamo Videotape Spurs Call for More Disclosure*, Bloomberg, July 16, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aiIb.fbmRpyc &refer=germany; *Conservative Media Dismiss Gitmo Abuse as 'Stressful,' Ignore Gruesome First-Hand Accounts*, Media Matters, June 16, 2005, http://mediamatters.org/research/200506160005; *see also* Damien McElroy, *Shocking Guantanamo Images Persist,* The Telegraph, Feb. 3, 2007 ("there is a black hole of information on some prisoners"), *available at* http://www.telegraph.co.uk/news/worldnews/ 1541490/Shocking-Guantanamo-images-persist.html; Scott Horton, *The Guantanamo "Suicides": A Camp Delta Sergeant Blows the Whistle*, Harper's, Jan. 18, 2010 ("The official story . . . was full of unacknowledged contradictions[.]"), *available at* http://harpers.org/ archive/2010/01/hbc-90006368.

65. There is also considerable interest in the specific case of Mr. al Qahtani, both as a detainee and as a symbol of the use of torture in Guantánamo. *See, e.g.*, Amnesty International, *Health Concern as Charges Against Mohamed al-Qahtani Dismissed*, May 27, 2008 ("Mohamed al-Qahtani's physical and mental health have long been a cause for concern following his torture and other ill-treatment during interrogation in Guantánamo[.]"); Steve Miles, *Medical Ethics and the Interrogation of Guantanamo 063*, The American Journal of Bioethics (2007); Adam Zagorin, *Exclusive: '20th Hijacker' Claims That Torture Made Him Lie*, Time, Mar. 3, 2006. Although the leaked interrogation log of Mr. al Qahtani has been made public, its cursory notations cannot convey the full scope of the government's abuse. For example, the log's statement that "Detainee was repulsed by the female invasion of his personal space," Interrogation Log, Dec. 9, 2002, at 2340, does not begin to capture the molestation that Mr. al

Qahtani experienced. Likewise, the log's statement that interrogators conducted the "pride and ego down approach. Played loud music to keep detainee awake," Interrogation Log Dec. 10, 2002 at 0000, does not in any way describe the humiliation involved or the horrific mental state of someone who has been severely sleep deprived for months.

66. The release of visual depictions of Mr. al Qahtani's treatment is also important because these images are likely to reach a wider audience than mere descriptions of his treatment, and will be more available, credible and memorable to the public than other forms of documentation. *See* Pew Research Center, *Americans Spending More Time Following the News* (Sept. 12, 2010) (58 percent of Americans stated they watched a news program on television the previous day, while only 37 percent had read a newspaper article, either in print or on-line), *available at* http://people-press.org/2010/09/12/section-1-watching-reading-and-listening-to-the-news/; Doris A. Graber, *Say It with Pictures*, 546 Annals Am. Acad. Pol. & Soc. Sci. 85, 86-89 (1996) (studies show that visual images arouse viewers' interest and attention and increase the perceived credibility of a news story). The Abu Ghraib "torture photos" illustrate the power of the visual image to foster enduring public interest in the treatment of detainees. *See* W.J.T. Mitchell, *Cloning Terror: The War of Images, 9/11 to the Present* (2011) (discussing the importance of the leaked Abu Ghraib photos).

67. Finally, the requested videotapes are important because no similar records have been made public to date. Indeed, the government has already destroyed hundred of hours of videotape depicting harsh interrogations of suspected terrorists, for the express purpose of avoiding public scrutiny: In November 2005, Jose Rodriguez, then the head of the CIA's clandestine service, ordered the destruction of 92 videotapes depicting CIA interrogations, explaining that he did so because the tapes would make the CIA "look terrible; it would be

devastating to us." *See* Mark Mazzetti, *C.I.A. Document Details Destruction of Tapes*, N.Y. Times, Apr. 15, 2010. Nor have any videotapes depicting interrogations in Guantánamo been released; the only declassified interrogation video from Guantánamo involves Canadian officials interrogating Omar Khadr, a juvenile, and merely shows Mr. Khadr in a fragile mental state after unspecified interrogation methods without portraying any other aspect of his treatment. *See* http://www.youtube.com/watch?v=aQHFFbD_-Pg&feature=player_embedded (original source: CBC News). The destruction of the CIA videotapes, and the absence of any other videotapes in the public domain depicting the treatment of detainees at Guantánamo (or elsewhere), makes it all the more important that the public have the opportunity to view images of Mr. al Qahtani's interrogation, as the best remaining record of the interrogation practices that the government has attempted to keep from the public.

68. Our democracy is built on a foundation of an informed populace. Without access to documentation regarding abuses such as the torture of Mr. al Qahtani, this nation is deprived of its best mechanism for holding officials accountable and its most powerful impetus to change policies. Access to information is, in sum, necessary for the functioning of a democracy. The release of the requested videotapes and photographs will allow the public to judge for itself the legitimacy or appropriateness of the Government's policies.

## CAUSES OF ACTION

### First Cause of Action: Violation of the FOIA for Failure to Expedite the Processing of Plaintiffs' Request.

69. Plaintiff repeats and realleges paragraphs 1-68.

70. Defendants' failure to expedite the processing of plaintiffs' request violates the FOIA, 5 U.S.C § 552(a)(6)(E)(iiii), and defendants' own regulations promulgated thereunder.

## Second Cause of Action: Violation of the FOIA for Failure to Make Promptly Available the Records Sought by Plaintiffs' Request.

71.  Plaintiff repeats and realleges paragraphs 1-68.

72.  Defendants' failure to make promptly available the records sought by plaintiffs' request violates the FOIA, 5 U.S.C. § 552(a)(3)(A).

## Third Cause of Action: Violation of the FOIA for Failure to Release Records Sought by Plaintiffs' Request.

73.  Plaintiff repeats and realleges paragraphs 1-68.

74.  Defendants' failure release to records sought by plaintiff's request violates the FOIA, 5 U.S.C. § 552(a).

## Fourth Cause of Action: Violation of the FOIA for Failure to Timely Respond to Plaintiffs' Request

75.  Plaintiff repeats and realleges paragraphs 1-68.

76.  Defendants' failure to timely respond to plaintiff's request violates the FOIA, 5 U.S.C. § 552(a)(6)(A)(i), and defendant agencies' own regulations promulgated thereunder.

## Fifth Cause of Action: Violation of the FOIA for Failure to Supply a Fee Waiver.

77.  Plaintiff repeats and realleges paragraphs 1-68.

78.  Defendants' failure to grant a fee waver violates 5 U.S.C. § 552(a)(4)(A)(iii).

## REQUESTED RELIEF

WHEREFORE, plaintiffs pray that this Court:

a)  order defendants immediately and expeditiously to process plaintiffs' FOIA requests and to

disclose the requested records, waiving all processing fees;

b)  award plaintiffs their costs and reasonable attorneys fees incurred in this action; and

c)  grant such other relief as the Court may deem just and proper.


Respectfully Submitted,


Lawrence S. Lustberg, Esq. (LL-1644)
Alicia L. Bannon, Esq. (AB-0503)
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4500

Sandra L. Babcock, Esq.
*(To be admitted pro hac vice)*
NORTHWESTERN LAW SCHOOL
357 E. Chicago Avenue
Chicago, IL 60611
(312) 503-0114

Dated: January 9, 2012