UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CENTER FOR CONSTITUTIONAL RIGHTS | ) | |
| Plaintiff, | ) | |
| v. | ) | 12 CIV 0135 (NRB) |
| DEPARTMENT OF DEFENSE, et al. | ) | |
| Defendants. | ) | |

**DECLARATION OF MAJOR GENERAL KARL R. HORST**

I, Major General Karl R. Horst, pursuant to 28 U.S.C. 1746, hereby declare as follows:

1. I currently serve as the Chief of Staff of United States Central Command (USCENTCOM), Department of Defense (DoD), and have held this position since July 2011. In this capacity I am responsible for the Headquarters of the Combatant Command, which consists of over 2,000 military personnel who, in turn, provide staff oversight for over 200,000 military personnel deployed across USCENTCOM's Area of Responsibility (AoR). This AoR consists of approximately 4.6 million square miles, covering twenty (20) countries, located

1

throughout the Middle East and Central Asia including Iraq, Afghanistan, and Pakistan.  With national and international partners, USCENTCOM seeks to promote cooperation among nations, respond to crises, deter or defeat state and non-state aggression, support development and, when necessary, reconstruction in order to establish the conditions for regional security, stability and prosperity within the AoR.

2.  Included in my official duties as the USCENTCOM Chief of Staff, I am a TOP SECRET original classification authority for all documents that originate within or are classified by USCENTCOM and/or its subordinate units pursuant to Executive Order 13526, *Classified National Security Information*, and the May 5, 2011 memorandum from the Deputy Secretary of Defense, SUBJECT: *Delegation of Top Secret Original Classification Authority*.  In addition, I am the Initial Denial Authority for Freedom of Information Act (FOIA) requests, and I am responsible for the Command's Freedom of Information Act and Privacy Act office, which processes and responds to FOIA requests and appeals.

3.  I have served in the United States Army for over thirty-four (34) years at various levels of Command and Staff.  I have commanded units at every echelon, within the United States and in USCENTCOM's AoR.  Prior to assuming the duties of the USCENTCOM Chief of Staff, I was the Commanding General of the United States Army, Military District of Washington and Joint Force Headquarters, National Capital Region.  My Staff experience includes serving as an aide-de-camp to the Army Chief of Staff, as well as a Joint Services and North Atlantic Treaty Organization (NATO) assignment as Special Assistant to the Supreme Allied Commander, Europe.  I have also served as the Chief of Staff, 82d Airborne Division, then as the Chief of Staff, XVIII Airborne Corps and Fort Bragg.  At the Combatant Command

2

level I served as the Director for Operations, Plans, Logistics and Engineering (J3/J4), United States Joint Forces Command, Norfolk, Virginia. As a result of this experience I have extensive personal knowledge of our forces and their capabilities, as well as those of the enemies who threaten the United States Forces, International Security Assistance Forces (ISAF), and Afghanistan Forces and interests.

4. I submit this declaration in support of DoD's Motion for Summary Judgment in the above-captioned case. The statements in this declaration are based upon my personal knowledge and upon information made available to me in the performance of my official duties. My conclusions are based on my years of service in the United States military and assessments and evaluations of the current situation in the CENTCOM AoR, assessments of my subordinate commanders, and the historical precedents discussed below.

5. I am aware that the Plaintiff in this case, Center for Constitutional Rights (CCR), has sued under the FOIA for the release of three categories of records: (1) videotapes of Mohammed al-Qahtani (ISN 063), made from February 13, 2002 through November 30, 2005; (2) photographs of Mr. al-Qahtani taken from February 13, 2002 through November 30, 2005 and (3) any other audio or visual recordings of Mr. al-Qahtani made from February 13, 2002 through November 30, 2005 (the "FOIA Request").

6. I am further aware that the Federal Bureau of Investigation (FBI) provided CCR with a declaration by David M. Hardy, dated June 4, 2012 (the "Hardy Declaration") that explained that FBI had identified 53 videotapes (the "FBI Videotapes") responsive to the FOIA Request, which they were withholding in their entirety based upon Exemptions 7(A) and 7(C) of FOIA, *see* 5 U.S.C. § 552(b) (7)(A), (7)(C). DoD also has equities in these 53 FBI Videotapes and DoD

has claimed Exemptions 1 and 6 as a further basis to withhold them in their entirety, as well as Exemption 3 to withhold portions of them, see 5. U.S.C. § 552(b)(1),(3), and (6).

7.  In addition, I am aware that DoD provided CCR with a declaration by Rear Admiral David B. Woods (the "Woods Declaration"), dated June 11, 2012, and a supplemental declaration by Mark H. Herrington (the "Herrington Declaration"), dated July 5, 2012, which detailed DoD's search.  The DoD located six responsive "mug shot" photographs of ISN 063, Mr. al-Qahtani, a single videotape depicting two forced cell extractions (FCEs) of Mr. al-Qahtani (the "FCE Videotape"), and two videotapes documenting intelligence debriefings of Mr. al-Qahtani taken in July 2002 and April 2004, (the "Debriefing Videotapes").

8.  I am also aware that the Woods Declaration sets forth a detailed explanation of the basis for withholding all of the videotapes and photographs pursuant to Exemption 1, including a description of the harm to national security that could reasonably be expected to result from their release.  As noted in the Woods Declaration, the information in the withheld records pertains to "military plans, weapons systems, or operations," pursuant to section 1.4(a) of Executive Order 13526.

9.  I am aware that DoD is also submitting a declaration by Mr. William K. Lietzau, Deputy Assistant Secretary of Defense for Rule of Law and Detainee Policy in the Department of Defense (the "Lietzau Declaration") and a classified declaration of Mark Herrington (the "Classified Herrington Declaration"), and supporting materials, both in support of DoD's Motion for Summary Judgment in the above-captioned litigation.  The Lietzau Declaration sets forth additional explanations for the basis for withholding all of the videotapes and photographs pursuant to Exemption 1, including a description of the harm to national security that could reasonably be expected to result from their release, and the Classified Herrington Declaration,

and supporting materials, sets forth additional explanations for the basis for withholding the Debriefing Videotapes, including a description of the harm to national security that could reasonably be expected to result from their release.  Because the Classified Herrington Declaration contains information that cannot be explained on the public record, DoD is providing it for the Court's review *ex parte* and *in camera*.

10.  In addition to the reasons set forth in the Woods Declaration, the Lietzau Declaration, and the Classified Herrington Declaration, for the reasons set forth in this declaration, I have concluded that the official release, in whole or in part, of 53 FBI Videotapes, the FCE Videotape, the Debriefing Videotapes and the photographs (collectively, the "Withheld Videotapes and Photographs") could reasonably be expected to harm national security, to include our defense against transnational terrorism by: (a) endangering the lives and physical safety of U.S. and Coalition Soldiers, Airmen, Marines, Sailors, civilians, and contractors presently serving in Afghanistan and at any Department of Defense detention facility; (b) endangering the lives and physical safety of Afghanistan civilians, police, military personnel, and government officials; (c) endangering the lives and physical safety of U.S. diplomats and aid workers; (d) adversely affecting security conditions in the CENTCOM AoR and (e) aiding in the recruitment and financing of extremists and insurgent groups.  All of the Withheld Videotapes and Photographs are therefore classified and exempt from release under FOIA Exemption 1.

11.  Prior experience from the release of photographs and information about detainees has demonstrated the harm to national security that the release of the Withheld Videotapes and Photographs could cause.  For example, in 2004, the media published photographs relating to the allegations of abuse of Iraqi detainees in Iraq.  Extremist groups used this revelation to recruit new members for, and motivate existing members of, their groups.  Reporting in the press also

indicated that some extremist groups staged and then disseminated additional faked photographs depicting abuses to take further advantage of the official release.  Similarly, in 2005 media reporting of alleged incidents of mishandling the Koran at JTF-GTMO led to international riots, civilian deaths, and irreparable damage to the accurate perception of the U.S. in world events.  In 2012 the release of a video depicting Marines urinating on the corpses of alleged Taliban members was used as a recruitment tool for the Taliban, and threatened to derail peace talks with the Taliban and the scheduled withdrawal of U.S. forces from Afghanistan.  Finally, in February 2012 international media reports regarding the burning of Korans in conjunction with the routine disposition of non-religious library books sparked weeks of riots, resulting in the deaths of four American soldiers and approximately 40 reported civilian deaths.  Enemy forces used each of these instances to delegitimize American military actions in Afghanistan and beyond in the eyes of sympathizers.  These experiences are a clear example of the tenuous nature of security in parts of the USCENTOM AoR, as well as the gravity of harm to national security which could reasonably be expected to result from the release of images that our enemies find or choose to characterize as inflammatory.  Release of the Withheld Videotapes and Photographs would present a significant risk of serious backlash.

12.  Specifically, enemy forces in Afghanistan and throughout the USCENTCOM AoR have previously used videos and photographs out of context to incite the civilian population and influence government officials and would likely utilize the Withheld Videotapes and Photographs in the same manner, putting civilians as well as United States, Afghanistan, and International Security Assistance Forces (ISAF) at increased danger.  The Taliban and associated enemy forces have used previously published photographs of U.S. forces interacting with detainees to incite violence, promulgate extremists' recruiting, and garner support for attacks

against the U.S. forces and ISAF.  These enemy tactics have not only strained relationships between the U.S. and foreign governments within USCENTCOM's AoR, but have resulted in the deaths and injury of U.S. and ISAF service members.

13.  USCENTCOM's AoR encompasses many areas that are very volatile, and extremist groups strive to incite violence, initiate riots and generate anti-American sentiment.  The subject of U.S. detainee operations in Iraq, Afghanistan, and at JTF-GTMO is extremely sensitive with the host nations and governments whose nationals we detain.  Enemy forces and extremist groups use comprehensive information operations to effectively exploit this sensitive subject. Any release of any portion of the Withheld Videotapes and Photographs would facilitate the enemy's ability to conduct information operations and could be used to increase anti-American sentiment, thereby placing the lives of U.S., ISAF, and Afghanistan service members at risk.

14. The FCE Videotape is particularly subject to use as propaganda and to incite a public reaction because of its depiction of forcible guard and detainee interaction.  This video could also be used to foment anti-American sentiment and inflame Muslim sensitivities.  Similarly, Debriefing Videotapes, which depict Mr. al-Qahtani in intelligence debriefings, the 53 FBI Videotapes, which portray Mr. al-Qahtani inside his cell during detention, and the photographs of Mr. al-Qahtani, could also be used to foment anti-American sentiment given that they all depict Mr. al-Qahtani in U.S. custody.

15.  Any released portion of the videos and photographs could also be easily manipulated so to be used as recruiting material to attract new members to join the insurgency. For example,

    a.  Extremist groups could splice released footage to change the chronology or combination of events, splicing these videos or segments of, with different footage, apply

soundtracks, and falsify the released videos by other means to develop completely new videos;

      b.  Extremist groups could use released portions of the video-recordings and overlay staged audio which falsely indicates the mistreatment of the detainees when none has occurred;

      c.  The released video-recordings could be pixelated to alter the images of the detainee's face or person to show physical signs of mistreatment, such as bruising or bleeding;

      d.  The released video-recordings could be spliced with non-released footage, such as anti-U.S. rallies or inflammatory speeches; and

      e.  Even short segments of released footage or still images created from them would be subject to manipulation.  In addition, knowing the still photograph was obtained from the released video-recordings in and of itself would be inflammatory given the sensitivities surrounding the U.S. detention of foreign nationals.

16.  Manipulation of visual imagery depicting DOD treatment of detainees has been used in the past to increase recruitment by extremist groups, as a fund-raising tool for extremist groups, and to encourage solidarity among extremist groups.

17.  Given the risk that our enemies could find or choose to characterize the responsive records as inflammatory, in light of my knowledge and experience, and for the additional reasons described herein, I have concluded that the Withheld Videotapes and Photographs must remain classified at the Secret level and be withheld in their entirety in order to prevent the reasonably likely harm to the national security which could result from their release.

18.  Based upon my intimate familiarity of the current fragile situations in Pakistan, Afghanistan and other locations in the CENTCOM AoR, it is my conclusion that release of these videos and photographs could reasonably be expected to adversely impact the political, military and civil efforts of the United States by fueling civil unrest, endanger the lives of U.S and Coalition forces, and providing a recruiting tool for insurgent and violent extremist groups thereby destabilizing partner nations.

I declare under penalty of perjury that the foregoing is true, accurate and correct.

Dated this 21ᵗʰ day of December 2012.

KARL R. HORST
Major General, U.S. Army
Chief of Staff, USCENTCOM
Tampa, FL