```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
CENTER FOR CONSTITUTIONAL RIGHTS,

                    Plaintiff,

            - against -

DEPARTMENT OF DEFENSE AND ITS COMPONENTS
DEFENSE INTELLIGENCE AGENCY AND UNITED
STATES SOUTHERN COMMAND; DEPARTMENT OF
JUSTICE AND ITS COMPONENTS FEDERAL BUREAU
OF INVESTIGATION AND EXECUTIVE OFFICE OF
UNITED STATES ATTORNEYS; and CENTRAL
INTELLIGENCE AGENCY,

                    Defendants.
----------------------------------------X
```

**MEMORANDUM AND ORDER**

12 Civ. 135 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

The Center for Constitutional Rights ("CCR") commenced this action under the Freedom of Information Act (the "FOIA"), 5 U.S.C. § 552, against the United States Department of Defense (the "DOD") and its components the Defense Intelligence Agency (the "DIA") and the United States Southern Command ("SouthCom"); the United States Department of Justice (the "DOJ") and its component the Federal Bureau of Investigation (the "FBI"); and the Central Intelligence Agency (the "CIA") (collectively, the "defendant agencies" or the "Government").[1]

In its FOIA requests, CCR seeks the public disclosure of images of Mohammed al-Qahtani ("al-Qahtani"), whom the United

---

[1]    The Executive Office of United States Attorneys was dismissed from this action on March 13, 2012. See Dkt. No. 11.

States has held at Guantánamo Bay, Cuba ("Guantánamo") since February 13, 2002.  The DOD and the FBI have admitted to possessing a number of responsive videotapes and photographs, which these agencies now seek to withhold.  The CIA, on the other hand, has filed a Glomar response asserting that it will neither confirm nor deny the existence of responsive records. To justify these responses, the defendant agencies invoke a number of FOIA exemptions.

Presently before the Court are CCR's motion for partial summary judgment with respect to the DOD and the FBI and the Government's cross-motion for summary judgment on behalf of all defendant agencies, including the CIA.[2]  For the reasons set forth below, we find that the DOD and the FBI have properly classified the videotapes and photographs of al-Qahtani in the interest of national security, and that the CIA has appropriately declined to confirm or deny the existence of responsive records.  Accordingly, we deny CCR's motion and grant the Government's cross-motion.

---

[2]   We heard oral argument on these motions on September 3, 2013. References preceded by "Tr." refer to the transcript of oral argument.

**BACKGROUND**[3]

I.   **Al-Qahtani**

Al-Qahtani is a Saudi national who is widely believed to be the intended 20th hijacker during the terrorist attacks of September 11, 2001. See First Lustberg Decl. Ex. 6, at 1 (positing that al-Qahtani "would have been on United Airlines Flight 93, the only hijacked aircraft that had four hijackers

---

[3]    Throughout this Memorandum and Order, we rely upon Plaintiff's Statement of Material Facts Pursuant to Local Rule 56.1 ("Pl.'s 56.1"), filed October 3, 2012; the Declaration of CCR's Counsel, Lawrence S. Lustberg ("First Lustberg Decl."), filed October 3, 2012, and the exhibits annexed thereto; the Declaration of CCR's Counsel and al-Qahtani's Habeas Corpus Counsel, Sandra L. Babcock ("Babcock Decl."), filed October 3, 2012; the Declaration of the Defendant Agencies' Counsel, Emily E. Daughtry ("First Daughtry Decl."), filed December 27, 2012, and the exhibits annexed thereto; the Declaration of the Information Review Officer for the National Clandestine Service of the CIA, Elizabeth Anne Culver ("Culver Decl."), filed December 27, 2012, and the exhibits annexed thereto; the Declaration of the Section Chief of the Record/Information Dissemination Section, Records Management Division, of the FBI, David M. Hardy ("First Hardy Decl."), filed December 27, 2012, and the exhibits annexed thereto; the Declaration of the Associate Deputy General Counsel in the Office of General Counsel of the DOD, Mark H. Herrington ("First Herrington Decl."), filed December 27, 2012; the Classified Declaration of the Associate Deputy General Counsel in the Office of General Counsel of the DOD, Mark H. Herrington ("Classified Herrington Decl."), filed December 27, 2012 for the Court's in camera, ex parte review; the Declaration of the Chief of Staff of the United States Central Command of the DOD, Major General Karl R. Horst ("Horst Decl."), filed December 27, 2012; the Declaration of the Deputy Assistant Secretary of Defense for Rule of Law and Detainee Policy in the DOD, William K. Lietzau ("Lietzau Decl."), filed December 27, 2012, and the exhibits annexed thereto; the Declaration of Chief of the FOIA Services Section within the FOIA and Declassification Services Branch for the DIA, Alesia Y. Williams ("Williams Decl."), filed December 27, 2012, and the exhibits annexed thereto; the Declaration of the Commander of Joint Task Force-Guantánamo, Rear Admiral David B. Woods ("Woods Decl."), filed December 27, 2012, and the exhibits annexed thereto; Plaintiff's Statement of Material Facts Pursuant to Local Rule 56.1(b) ("Pl.'s 56.1(b)"), filed February 4, 2013; the Third Declaration of the Section Chief of the Record/Information Dissemination Section, Records Management Division, of the FBI, David M. Hardy ("Third Hardy Decl."), filed April 8, 2013, and the Descriptive Index of Video Records ("Sealed Index"), filed ex parte and under seal; and the Second Declaration of the Associate Deputy General Counsel in the Office of General Counsel of the DOD, Mark H. Herrington ("Second Herrington Decl."), filed April 8, 2013.

instead of five"). A month before the attacks, immigration officials denied al-Qahtani entry to the United States at Orlando International Airport. Id.; see also First Lustberg Decl. Ex. 31 (hereinafter "FBI-OIG"), at 78 n.46 (explaining that al-Qahtani sought to enter the United States with "no return ticket, no credit cards, and less than $3,000 cash"). On December 15, 2001, Pakistani forces captured al-Qahtani on the Pakistan-Afghanistan border and turned him over to the United States. FBI-OIG 77. Approximately two months later, on February 13, 2002, the United States transported al-Qahtani to Guantánamo, see id., where he remains to this day.

As CCR correctly notes, agency reports and Congressional hearings have revealed numerous facts concerning al-Qahtani's detention and interrogation, most frequently in the context of official inquiries into the treatment of Guantánamo detainees. See, e.g., FBI-OIG; First Lustberg Decl. Ex. 2 (hereinafter "SASC Report"); First Lustberg Decl. Ex. 3 (hereinafter "Church Report"); First Lustberg Decl. Ex. 4 (hereinafter "Schmidt-Furlow Report"); First Lustberg Decl. Ex. 7 (hereinafter "Fine Statement"). Specifically, information related to the following subjects has been disclosed:

> (1)  the dates, locations, and conditions of al-Qahtani's confinement, see, e.g., FBI-OIG 27-29, 77, 80-81; SASC Report 58, 60-61, 108-09; Church Report 101;

(2)   the involvement of the DOD and the FBI in al-
Qahtani's interrogation, <u>see, e.g.</u>, FBI-OIG 78, 80-
83, 102; SASC Report 57-58, 60; Fine Statement 6;

(3)   the techniques the interrogators used, <u>see e.g.</u>, FBI-
OIG 83-84, 87, 102-03, 197; Fine Statement 6-7; SASC
Report 60, 109; Schmidt-Furlow Report 13-21; First
Lustberg Decl. Ex. 5, at 1-2;

(4)   al-Qahtani's mental and physical state during his
interrogations, <u>see, e.g.</u>, First Lustberg Decl. Ex.
20, at 111-12; FBI-OIG 103; First Lustberg Decl. Ex.
15 (hereinafter "Harrington Letter"), at 2; and

(5)   al-Qahtani's ultimate cooperation with interrogators,
including the information he provided, <u>see, e.g.</u>,
FBI-OIG 118-19; First Lustberg Decl. Ex. 6, at 1-2.

Furthermore, the New York Times has published a photograph of
al-Qahtani.  <u>See</u> First Lustberg Decl. Ex. 28.  However, the
Government maintains that "the United States did not release"
this image.  Tr. 29:23.

The foregoing disclosures reveal that, between August 2002
and November 2002, FBI and military personnel subjected al-
Qahtani to both "intense isolation," <u>see</u> Harrington Letter 2,
and "aggressive" interrogation techniques, <u>see</u> FBI-OIG 84
(internal quotation marks omitted); <u>see also</u> Fine Statement 6
(disclosing that "FBI agents saw military interrogators use
increasingly harsh and demeaning techniques, such as menacing
Al-Qahtani with a snarling dog during his interrogation").
During this time, al-Qahtani lost significant amounts of
weight, <u>see</u> First Lustberg Decl. Ex. 20, at 112, and exhibited
symptoms of "extreme psychological trauma," including "talking

to non-existent people, reporting hearing voices, [and] crouching in a corner of the cell covered with a sheet for hours on end," see Harrington Letter 2.

On November 23, 2003, military interrogators implemented the first "Special Interrogation Plan" against al-Qahtani. SASC Report 74, 88. Over the next 54 days, interrogators subjected al-Qahtani to "stress positions" and "20-hour interrogations, tying a dog leash to his chain and leading him through a series of dog tricks, stripping him naked in the presence of a female, repeatedly pouring water on his head, and instructing him to pray to an idol shrine." Fine Statement 6-7; see also SASC Report 82, 88. In December 2002, these practices resulted in al-Qahtani's hospitalization for "low blood pressure" and "low body core temperature." FBI-OIG 103; see also First Lustberg Decl. Ex. 22, at "07 December 2002." On January 14, 2009, the Convening Authority for Military Commissions Susan J. Crawford reached the conclusion that the treatment of al-Qahtani "met the legal definition of torture." First Lustberg Decl. Ex. 1, at 1.

CCR, its counsel in this matter, and others currently represent al-Qahtani in a habeas corpus action stayed in the United States District Court for the District of Columbia before the Honorable Rosemary M. Collyer (the "Habeas Action"). See al-Qahtani v. Obama, No. 05 Civ. 1971 (D.D.C.). In

connection with their representation of al-Qahtani in the Habeas Action, counsel have viewed certain materials of which CCR now seeks public disclosure.  Mem. of Law in Supp. of Pl.'s Mot. for Partial Summ. J. ("Pl.'s Br.") 10; see also Mem. & Op. Order 3-4, al-Qahtani v. Obama, No. 05 Civ. 1971, Dkt. No. 192 (D.D.C. Oct. 5, 2009) (granting discovery with respect to audio/video recordings of al-Qahtani made between November 15, 2002 to November 22, 2002).

## II.  The FOIA Requests and Responses

### A.   CCR's FOIA Requests and Litigation

On March 4, 2010, CCR submitted FOIA requests to the DOD, the DIA, SouthCom, the DOJ, the FBI, and the CIA.  See Woods Decl. ¶ 5; Williams Decl. ¶ 5; First Hardy Decl. ¶ 5; Culver Decl. ¶ 9.[4]  In its requests, CCR sought three categories of records:  (1) videotapes of al-Qahtani made between February 13, 2002, when he arrived at Guantánamo, and November 30, 2005; (2) photographs of al-Qahtani taken between February 13, 2002 and November 30, 2005; and (3) any other audio or visual records of al-Qahtani made between February 13, 2002 and November 30, 2005.  See, e.g., Woods Decl. Ex. 1, at 2.  The defendant agencies failed to issue timely responses to CCR's

---

[4]     As the Government notes, "[t]he Woods, Williams, Culver, and First Hardy Declarations describe the administrative process in detail.  The facts of the administrative process are not in dispute."  Mem. of Law in Opp'n to Pl.'s Mot. for Partial Summ. J. and in Supp. of the Government's Cross-Mot. for Summ. J. ("Gov't Br.") 3, n.2.

requests.  Pl.'s 56.1 ¶ 3.  Accordingly, on January 9, 2012, CCR filed the instant action, seeking, <u>inter alia</u>, the immediate processing and release of all responsive records.

**B.   The Defendant Agencies' Responses**

After the filing of this action, the defendant agencies each provided CCR with a declaration detailing their searches and bases for withholding responsive records, or, in the case of the CIA, a Glomar response asserting that it would neither confirm nor deny the existence of responsive records.  <u>Id.</u> ¶ 5. In addition, the DOD offered supplemental declarations in opposition to CCR's motion for partial summary judgment and in support of the Government's cross-motion.  <u>See</u> <u>infra</u> Section II(A)(2).

1.   <u>The DOD's and the FBI's Responses</u>

The DOD and the FBI collectively identified four categories of responsive records:  (1) fifty-three videotapes that depict al-Qahtani's activities within his cell, as well as his interaction with DOD personnel (the "FBI Videotapes"); (2) one videotape showing forced cell extractions (the "FCE Videotape"); (3) two videotapes depicting intelligence debriefings (the "Debriefing Videotapes"); and (4) six photographs of al-Qahtani (the "Photographs") (collectively, the "Withheld Videotapes and Photographs").  As detailed below, the DOD and the FBI resist disclosure of the Withheld

Videotapes and Photographs on the basis of several FOIA exemptions.

a. *The FBI Videotapes: Exemptions 1, 3, 6, 7(A), and 7(C) of the FOIA and Section (j)(2) of the Privacy Act*

The FBI Videotapes depict al-Qahtani's activities within his cell, as well as his interaction with DOD personnel at Guantánamo between August 2002 and November 2002. First Hardy Decl. ¶ 29. The FBI has provided an individualized description of the 53 FBI Videotapes in an index filed ex parte for in camera review. See Third Hardy Decl. ¶ 2; Sealed Index; see also Dkt. No. 55 (granting the Government's request to file the sealed index ex parte for in camera review).

As pertinent here, the DOD and the FBI seek to withhold the FBI Videotapes in their entirety based on FOIA Exemption 1, 5 U.S.C. § 552(b)(1), which applies to information that is properly classified in the interest of national defense or foreign policy. See Woods Decl. ¶ 29; First Hardy Decl. ¶ 4.[5] The DOD and the FBI also seek to withhold the FBI Videotapes pursuant to FOIA Exemption 3, 5 U.S.C. § 552(b)(3), which applies to documents specifically exempted from disclosure by statute; FOIA Exemption 6, id. § 552(b)(6), which protects

---

[5]     Although the FBI maintains the original FBI Videotapes, the DOD classified these records pursuant to its classification authorities. First Hardy Decl. ¶ 30. Accordingly, the FBI refers the Court to the DOD's declaration in support of withholding the FBI Videotapes pursuant to FOIA Exemption 1. Id. ¶¶ 30, 38.

privacy interests in all records held by the Government; FOIA Exemption 7(A), id. § 552(b)(7)(A), which provides for the withholding of law enforcement records when disclosure would reasonably be expected to interfere with enforcement proceedings; FOIA Exemption 7(C), id. § 552(b)(7)(C), which protects privacy interests in law enforcement records; and Section (j)(2) of the Privacy Act, id. § 552a(j)(2). Woods Decl. ¶¶ 16, 32; First Hardy Decl. ¶ 4.[6]

    b.   *The FCE Videotape:  FOIA Exemptions 1, 3, and 6*

    The FCE Videotape, which was located by the DOD, depicts two forced cell extractions ("FCE") of al-Qahtani, at least one of which occurred on September 8, 2004.  First Herrington Decl. ¶ 5; Woods Decl. ¶ 11.  According to the DOD's declarations, the recording of the first FCE lasts approximately 10 minutes and 41 seconds.  First Herrington Decl. ¶ 5(a).  The recording begins with a DOD officer identifying the reason for the FCE, the name of the official who authorized the operation, and the current date and time.  First Herrington Decl. ¶ 5(a); Woods Decl. ¶ 11.  FCE team members then state their name, rank, and function, and start toward al-Qahtani's cell.  Id.  After an interpreter speaks with al-Qahtani, the FCE team begins and

---

[6]     The FBI refers the Court to the DOD's declaration in support of withholding the FBI Videotapes pursuant to FOIA Exemptions 3, 6, and 7(C). Id.  The FBI only discusses FOIA Exemption 7(A) and Section (j)(2) of the Privacy Act in its own declaration.  Id. ¶¶ 32-37.

successfully completes the FCE.  First Herrington Decl. ¶ 5(a).
Thereafter, medical personnel check al-Qahtani, and the FCE
team transfers al-Qahtani to a separate room.  Id.  During the
first FCE, al-Qahtani is not independently visible (i.e.,
outside the presence of military personnel) for more than one
second.  Id.

The recording of the second FCE lasts approximately 5
minutes and 12 seconds.  Id. ¶ 5(b).  Unlike the recording of
the first FCE, the recording of the second FCE does not depict
any events prior to the FCE.  Id.  Rather, the recording begins
with FCE team members staged at al-Qahtani's cell door.  Id.
The recording shows the FCE team extracting al-Qahtani from his
cell and moving him to a separate room.  Id.  During the final
9 seconds of the video, al-Qahtani is alone and visible,
outside the presence of military personnel.  Id.  The DOD seeks
to withhold the FCE Videotape in its entirety pursuant to
Exemptions 1, 3, and 6 of the FOIA.  Woods Decl. ¶ 16.

c.  *The Debriefing Videotapes:  Exemptions 1, 3, and 6*

The Debriefing Videotapes document intelligence
debriefings of al-Qahtani taken in July 2002 and April 2004.
Id. ¶ 14.  The DOD has described the Debriefing Videotapes in
greater detail in a classified declaration submitted to this
Court ex parte for in camera review.  See generally Classified
Herrington Decl; see also infra n.10 (finding it appropriate to

consider the Classified Herrington Declaration).  The DOD seeks to withhold the Debriefing Videotapes in their entirety on the basis of FOIA Exemptions 1, 3, and 6.  Woods Decl. ¶ 16.

      d.   *The Photographs:  Exemptions 1, 6, 7(A), and 7(C)*

The Photographs, which were located by the DOD,[7] were taken between 2002 and 2005.  Id. ¶¶ 9, 12.  Four of the Photographs are forward-facing mug shots, and two of the Photographs show al-Qahtani in profile.  Id.  The DOD seeks to withhold the Photographs pursuant to Exemptions 1, 6, 7(A), and 7(C) of the FOIA.  Id. ¶ 16.

**C.  The CIA's Response**

On March 24, 2010, the CIA issued a Glomar response to CCR's FOIA request, explaining that the CIA could "neither confirm nor deny the existence or nonexistence" of records responsive to CCR's request, because the "fact of the existence or nonexistence of requested records is currently and properly classified."  Culver Decl. Ex. A.  On May 26, 2010, CCR appealed the CIA's response on the basis that the "CIA's involvement in Mr. al Qahtani['s] interrogations is publically known."  Culver Decl. ¶ 11.  On August 17, 2011, the CIA denied CCR's appeal.  Culver Decl. Ex. C, at 2.

---

[7]    The FBI also identified two responsive photographs that originated with the DOD.  First Hardy Decl. ¶ 28.  The FBI referred these photographs to the DOD for a direct response.  Id.

III. <u>Subsequent Procedural History</u>

On July 18, 2012, the Court stayed briefing in this matter pending the outcome of a motion al-Qahtani filed in the <u>Habeas</u> Action seeking to modify the applicable protective orders governing the use of classified information in that case. <u>See</u> Dkt. No. 13. Specifically, al-Qahtani sought to amend the protective orders in the <u>Habeas</u> Action to permit his counsel to file a classified declaration in this action concerning information counsel learned in the course of representing al Qahtani in the <u>Habeas</u> Action. <u>Id.</u> On August 30, 2012, Judge Collyer denied al-Qahtani's motion. <u>See</u> First Daughtry Decl. Ex. A.

According to Judge Collyer, al-Qahtani failed to demonstrate that this Court has a "need to know" the classified information from the <u>Habeas</u> Action. <u>Id.</u> Judge Collyer wrote:

> Because the Government bears the burden of proof in a FOIA case and can meet that burden based on a sufficiently detailed agency affidavit, the only question that a FOIA court addresses is whether the affidavit adequately demonstrates the adequacy of the search and the propriety of the FOIA exemptions claimed . . . . Courts are unwilling to give any weight to a FOIA requester's personal views regarding the propriety of classification or the national security harm that would result from the release of classified information.

<u>Id.</u>, at 2. Despite Judge Collyer's ruling, CCR persists in urging this Court to "consider a sealed submission from

Plaintiff's counsel."   Pl.'s Br. 14; <u>see also</u> Mem. of Law in Opp'n to Defs.' Cross-Mot. for Summ. J. ("Pl.'s Opp'n") 18-20.

**<u>DISCUSSION</u>**

I.   <u>**Legal Standards**</u>

The "FOIA represents Congress's balance 'between the right of the public to know and the need of the Government to keep information in confidence.'"   <u>N.Y. Times Co. v. U.S. Dep't of Justice</u>, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012) (quoting <u>John Doe Agency v. John Doe Corp.</u>, 493 U.S. 146, 152 (1989)). Therefore, although the FOIA "strongly favor[s] public disclosure of information in the possession of federal agencies," <u>Halpern v. Fed. Bureau of Investigation</u>, 181 F.3d 279, 286 (2d Cir. 1999), the statute recognizes "that public disclosure is not always in the public interest," <u>Cent. Intelligence Agency v. Sims</u>, 471 U.S. 159, 166-67 (1985), and mandates that records need not be disclosed if they fall within "one of the specific, enumerated exemptions set forth in the Act," <u>Long v. Office of Pers. Mgmt.</u>, 692 F.3d 185, 190 (2d Cir. 2012) (internal quotation marks omitted); <u>see also</u> <u>Wilner v. Nat'l Sec. Agency</u>, 592 F.3d 60, 68 (2d Cir. 2009) (describing the Glomar standards).

"Summary judgment is the preferred procedural vehicle for resolving FOIA disputes."   <u>Nat'l Immigration Project of Nat'l Lawyers Guild v. U.S. Dep't of Homeland Sec.</u>, 868 F. Supp. 2d

284, 290 (S.D.N.Y. 2012) (internal quotation marks omitted). Where, as here, a plaintiff challenges an agency's decision to withhold responsive records and/or to file a Glomar response, the agency bears the burden of establishing the applicability of a FOIA exemption.  Long, 692 F.3d at 190; Wilner, 592 F.3d at 68.  The agency may satisfy this burden through reasonably detailed affidavits, which "are accorded a presumption of good faith."  Long, 692 F.3d at 190-91 (quoting Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994)) (internal quotation marks omitted).  The FOIA expressly provides for de novo review of an agency's decision.  5 U.S.C. § 552(a)(4)(B). In the context of national security, however, a court "must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." Am. Civil Liberties Union v. Dep't of Justice, 681 F.3d 61, 69 (2d Cir. 2012) ("ACLU") (internal quotation marks omitted). "Ultimately, an agency may invoke a FOIA exemption if its justification 'appears logical or plausible.'"  Id. (quoting Wilner, 592 F.3d at 73).

"[O]nce the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise

inappropriate."   <u>Amnesty Int'l USA v. Cent. Intelligence</u> <u>Agency</u>, 728 F. Supp. 2d 479, 497 (S.D.N.Y. 2010) (quoting <u>Carney</u>, 19 F.3d at 812) (internal quotation marks omitted).   To meet this burden, the plaintiff must offer more than "bare allegations."   <u>Carney</u>, 19 F.3d at 813.   Therefore, "[p]urely speculative claims of bad faith will not suffice."   <u>Plunkett v.</u> <u>Dep't of Justice</u>, 924 F. Supp. 2d 289, 306 (D.D.C. 2013) (internal quotation marks omitted).

## II. <u>Analysis</u>

As noted <u>supra</u>, CCR challenges in its motion for partial summary judgment the DOD's and the FBI's refusal to disclose the Withheld Videotapes and Photographs.   In its cross-motion, the Government not only contends that the DOD and the FBI have appropriately withheld the responsive records, but also maintains that the CIA properly declined to confirm or deny the existence of responsive records.   For the reasons set forth below, we agree with the Government's positions.

### A. **The DOD and the FBI Have Satisfied Their Burden of Establishing the Applicability of FOIA Exemption 1 to All of the Withheld Videotapes and Photographs**

#### 1. <u>Analytical Framework</u>

FOIA Exemption 1 permits agencies to withhold any records that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in

fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).  In this case, the DOD has classified all of the Withheld Videotapes and Photographs as SECRET pursuant to Executive Order 13,526, Exec. Order No. 13,526 § 1.2(a)(2) (Dec. 29, 2009).[8]  See Woods Decl. ¶ 29; Horst Decl. ¶ 17; Lietzau Decl. ¶ 4.  To justify these classifications, the DOD must demonstrate, inter alia, that (1) the Withheld Videotapes and Photographs "fall[] within one or more of the categories of [classifiable] information," Exec. Order No. 13,526 § 1.1(a)(3), and (2) "the unauthorized disclosure of that information reasonably can be expected to result in damage to the national security," id. § 1.1(a)(4).[9]

To satisfy this burden, the DOD asserts that the Withheld Videotapes and Photographs are properly classified as "military plans, weapons systems, or operations," id. § 1.4(a), "intelligence activities (including covert action), intelligence sources or methods, or cryptology," id. § 1.4(c), or "foreign relations or foreign activities of the United States," id. § 1.4(d).  See Woods Decl. ¶ 29; Horst Decl. ¶ 8; Lietzau Decl. ¶ 6, and that the release of these materials can

---

[8]    As noted supra, the FBI also asserts Exemption 1 protections.  See supra n.5.  However, the FBI refers the Court to the DOD's declarations in support of withholding.  Id.; see also First Hardy Decl. ¶¶ 30, 38.
[9]    In this context, "damage to the national security" is defined as "harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information."  Exec. Order No. 13,526 § 6.1(l).

reasonably be expected to damage national security, see generally Woods Decl.; Horst Decl.; Lietzau Decl.; Classified Herrington Decl. Although CCR purports to challenge whether the Withheld Videotapes and Photographs fall within the categories of classifiable information the DOD has invoked, see, e.g., Pl.'s Br. 19, CCR centers its attack on the DOD's assertion that release of these materials would visit harm upon national security. As noted supra, the Government need only demonstrate that it is logical or plausible that such harm reasonably could occur. ACLU, 681 F.3d at 69.

  2. The DOD's Declarations

  To demonstrate the potential harm to national security attendant to disclosure, the DOD offers the public declarations of original classification authorities Major General Karl R. Horst ("General Horst"), Rear Admiral David B. Woods ("Admiral Woods"), and Deputy Assistant Secretary of Defense William K. Lietzau ("DASD Lietzau"), and the classified declaration of Mark H. Herrington ("Herrington"), filed ex parte for in camera

review.[10]   As detailed below, General Horst, Admiral Woods, and
DASD Lietzau set forth independent justifications for the DOD's
assertion that disclosure of <u>any portion</u> of the Withheld
Videotapes and Photographs could reasonably be expected to
damage national security.   Admiral Woods and DASD Lietzau
provide additional rationales for withholding the FCE
Videotape, while Herrington provides "further information
regarding damage to national security that could reasonably be
expected to result from disclosure of the Debriefing Videos."
Gov't Br. 17.

    a.   *General Horst*

    General Horst is responsible for the oversight of
approximately 200,000 U.S. military personnel in Iraq,
Afghanistan, and the surrounding region.   Horst Decl. ¶ 1.
According to General Horst, disclosure of any portion of the
Withheld Videotapes and Photographs could reasonably be

---

[10]   Plaintiff urges the Court to refrain from considering the
Classified Herrington Declaration in the absence of further development of
the public record. Pl.'s Opp'n 18; <u>see also</u> <u>Wilner</u>, 592 F.3d at 68 (stating
that a "court should attempt to create as complete a public record as is
possible" before accepting an <u>ex parte</u> submission (internal quotation marks
omitted)).   As plaintiff contends, courts are generally disinclined to rely
on <u>ex parte</u> submissions.   <u>See, e.g.</u>, <u>Wilner</u>, 592 F.3d at 76 (recognizing
"our legal system's preference for open court proceedings").   However, such
reluctance "dissipates considerably" where, as here, national security
concerns are at issue.   Order at 2, <u>Am. Civil Liberties Union v. Dep't of
Defense</u>, 09 Civ. 8071 (BSJ) (S.D.N.Y. Jan. 23, 2012), Dkt. No. 102.   Having
independently reviewed the Classified Herrington Declaration, we find that
"the risk associated with disclosure of the document in question outweighs
the utility of counsel, or adversary process, in construing a supplement to
the record." <u>Id.</u> at 3.   Accordingly, we properly consider the DOD's <u>ex
parte</u> submission.   We note, however, that the contents of that submission
were not necessary to our resolution of the instant motions.   <u>See</u> Tr. 17:7-
21.

expected to harm national security by "endangering the lives and physical safety" of U.S. military personnel, diplomats, and aid workers serving in Afghanistan and elsewhere.  Id. ¶ 10. To substantiate this claim, General Horst states that "enemy forces in Afghanistan" and elsewhere "have previously used videos and photographs out of context to incite the civilian population and influence government officials." Id. ¶ 12.  For example, General Horst notes that the Taliban and associated forces have used "published photographs of U.S. forces interacting with detainees" to "garner support for attacks" against U.S. forces.  Id.

According to General Horst, disclosure of the Withheld Videotapes and Photographs could also aid in the "recruitment and financing of extremists and insurgent groups." Id. ¶ 10. General Horst notes that any released portion of the Withheld Videotapes and Photographs could be "easily manipulated" to attract new members to join the insurgency, as has occurred in the past.  Id. ¶¶ 15-16.  General Horst states that extremist groups could "pixelate[]" disclosed images of al-Qahtani "to show physical signs of mistreatment, such as bruising or bleeding," id. ¶ 15(c); overlay "staged audio" on released video segments to "falsely indicate the[] mistreatment" of al-Qahtani where no mistreatment occurred, id. ¶ 15(b); and/or "splice released footage" of al-Qahtani "to change the

chronology or combination of events," id. ¶ 15(a). General Horst states that extremists have previously used these tactics to recruit, raise funds, and encourage solidarity. Id. ¶ 16.

   b.  *Admiral Woods*

Admiral Woods is the Commander of Joint Task Force-Guantanamo ("JTF-GTMO"). Woods Decl. ¶ 1. In his declaration, Admiral Woods maintains that disclosure of any portion of the Withheld Videotapes and Photographs could reasonably be expected to damage national security by "chilling" intelligence collection efforts at JTF-GTMO and elsewhere. Id. ¶ 25. According to Admiral Woods, the public release of al-Qahtani's image will "make it substantially less likely that the detainee will cooperate and provide information in the future" because such release could provide "the appearance of cooperation with the United States," regardless of whether al-Qahtani has actually cooperated. Id. ¶ 25 (emphasis omitted). Admiral Woods notes that, "in some cases," the appearance of cooperation has led to "retribution" against the detainee and his family. Id. ¶ 24. Therefore, Admiral Woods submits that release of the Withheld Videotapes and Records will "exacerbate" al-Qahtani's "fears of reprisal and make it substantially less likely" that he will cooperate in the future. Id. ¶ 25.

According to Admiral Woods, disclosure of the Withheld Videotapes and Photographs could also be expected to dissuade the cooperation of human sources other than al-Qahtani. Id. ¶ 26. Admiral Woods writes: "If a potential source has any doubts about the government's ability to protect cooperative relationships, that is, if he or she were to learn that the government has disclosed the identity of another source -- or the identity of a person suspected to be a source -- his or her desire to cooperate would likely diminish." Id. Admiral Woods states that "[t]he loss of such sources, and the accompanying critical intelligence they provide, would seriously affect the national security of the United States." Id. Accordingly, Admiral Woods contends that the United States' "policy to classify images of current and former detainees must be consistently applied." Id. ¶ 27.

c. *DASD Lietzau*

DASD Lietzau is "responsible for developing policy recommendations and coordinating policy guidance relating to individuals captured or detained" by the DOD. Lietzau Decl. ¶ 1. In his declaration, DASD Lietzau states that disclosure of any portion of the Withheld Videotapes and Photographs could reasonably be expected to damage national security by "providing a means for detainees to communicate outside of approved channels, including with enemy forces." Id. ¶ 7.

DASD Lietzau notes:  "If images of detainees were to be released to any member of the public who requests them, detainees would quickly learn that these videos and photographs are a useful means for communicating with others, potentially including al-Qaeda and associated enemy forces."  Id. ¶ 7(a). According to DASD Lietzau, "[d]etainees have attempted to communicate with al-Qaeda affiliates in the past," including through such "covert or surreptitious means."  Id.

DASD Lietzau notes that release of the Withheld Videotapes and Photographs could also cause "international partners to question the U.S. commitment to its longstanding policy and practice of shielding detainees from public curiosity, consistent with the Geneva Conventions."  Id. ¶ 7.  DASD Lietzau maintains that public disclosure of the Withheld Videotapes and Photographs would subject al-Qahtani to "public curiosity in ways that could be seen as humiliating or degrading."  Id. ¶ 7(b).  Accordingly, DASD Lietzau posits that disclosure of the Withheld Videotapes and Photographs "could affect the practice of other states in this regard, which could, in turn, dilute protections afforded U.S. service personnel in future conflicts."  Id.

> d.  *The DOD's Additional Justifications for Withholding the FCE Videotape and the Debriefing Videotapes*

As noted <u>supra</u>, Admiral Woods and DASD Lietzau each provide additional reasons for withholding the FCE Videotape, and Herrington offers further, classified information concerning the Debriefing Videotapes.  Admiral Woods maintains that disclosure of the FCE Videotape "could result in the development of tactics and procedures to thwart the actions of the FCE team, thereby placing the safety and welfare of the members in jeopardy."  Woods Decl. ¶ 28.  Similarly, DASD Lietzau notes, <u>inter alia</u>, that disclosure of the FCE Videotape could harm national security by "encouraging disruptive behavior" by DOD detainees "simply to confirm their continued resistance to the United States in the ongoing armed conflict." <u>Id.</u> ¶ 8(a).

### 3.  <u>Analysis</u>

"Recognizing the relative competencies of the executive and judiciary," we find it both logical and plausible that the disclosure of any portion of the Withheld Videotapes and Photographs could reasonably be expected to harm national security. <u>ACLU</u>, 681 F.3d at 70 (internal quotation marks omitted).  CCR contends that many of the DOD's justifications are questionable in light of the Government's extensive disclosures concerning al-Qahtani. <u>See, e.g.</u>, Woods Decl.

¶¶ 24-25 (positing that al-Qahtani would fear retaliation on account of the "appearance of cooperation" that disclosure might produce, rather than the actual cooperation the Government has confirmed). In addition, CCR contends that other DOD justifications sweep far too broadly in the absence of more specific detail. See, e.g., Lietzau Decl. ¶ 7 (alleging that disclosure of any portion of the Withheld Videotapes and Photographs would provide a means for detainees to covertly communicate with their associates but failing to describe how a mug shot could be used for this purpose).

Ultimately, however, we find that the DOD's submissions provide adequate justification for the Government's invocation of FOIA Exemption 1. In particular, we find it both logical and plausible that extremists would utilize images of al-Qahtani (whether in native or manipulated formats) to incite anti-American sentiment, to raise funds, and/or to recruit other loyalists, as has occurred in the past. See Horst Decl. ¶¶ 15-16; accord Int'l Counsel Bureau v. U.S. Dep't of Defense, 906 F. Supp. 2d 1, 7 (D.D.C. 2012) (finding it plausible that "release of even solo images" of FCE videotapes could be

"manipulated and/or used as a propaganda tool").[11]   Such misuse is particularly plausible in this case, which involves a high-profile detainee, the treatment of whom the Convening Authority for Military Commissions Susan J. Crawford determined "met the legal definition of torture." First Lustberg Decl. Ex. 1, at 1.

Moreover, we find it entirely plausible that disclosure of the Withheld Videotapes and Photographs could compromise the Government's cooperative relationships with other Guantánamo detainees.  Woods Decl. ¶ 26; see also Associated Press v. U.S. Dep't of Defense, 462 F. Supp. 2d 573, 576 (S.D.N.Y. 2006) (deeming it plausible that "official public disclosure" of detainee photographs would "exacerbate the detainees' fears of reprisal, thus reducing the likelihood that detainees would cooperate in intelligence-gathering efforts").[12]   Accordingly, we conclude that the Government has satisfied its burden of establishing the applicability of FOIA Exemption 1.

In its effort to avoid this result, CCR notes that the Government has "safely released" (1) images of other detainees and (2) extensive factual information concerning al-Qahtani.

---

[11]   See also Judicial Watch, Inc. v. U.S. Dep't of Defense, 857 F. Supp. 2d 44, 61 (D.D.C. 2012) (upholding the CIA's application of FOIA Exemption 1 to photographs and/or video records of Osama bin Laden based on the CIA's declaration that "release of any of the records reasonably could be expected to inflame tensions among overseas populations," "encourage propaganda," or "lead to retaliatory attacks against the United States" (internal quotation marks omitted)), aff'd, 715 F.3d 937 (D.C. Cir. 2013).

[12]   Although we need not reach the issue, we note that the DOD has provided other plausible reasons for withholding the FCE Videotape and Debriefing Videotapes.  See supra Section II(A)(2)(d).

Pl.'s Opp'n 17.   Thus, CCR contends that it is "highly suspect that _every_ image of al-Qahtani" will cause harm to national security.   _Id._   However, the facts about image release are far more nuanced than CCR acknowledges.   With the limited exceptions of (1) photographs used for border control and military commission trials and (2) photographs taken by the International Committee of the Red Cross ("ICRC") and released to a consenting detainee's family,[13] the Government has not disclosed any images in which a specific detainee is identifiable.   Second Herrington Decl. ¶ 5; _see also_ First Lustberg Decl. Exs. 19, 25, 26, 30, 32.   Further, the Government's release of _written_ information concerning al-Qahtani does not diminish its explanations for withholding _images_ of al-Qahtani.   To the contrary, the written record of torture may make it all the more likely that enemy forces would use al-Qahtani's image against the United States' interests.   _See_ _Judicial Watch_, 857 F. Supp. 2d at 48 ("A picture may be

---

[13]   We do not reach the Government's invocation of al-Qahtani's privacy interests.   Nonetheless, we note that al-Qahtani, unlike many other detainees, has not permitted the ICRC to take his photograph.   Second Herrington Decl. ¶ 6.   Given the extensive public record in this case, we believe that al-Qahtani's interest in avoiding further privacy invasions is entitled to considerable weight.   Although CCR suggests that al-Qahtani has (or will) waive his privacy interests in the Withheld Videotapes and Photographs, _see_ Babcock Decl. ¶¶ 2-4; Pl.'s Opp'n 34, CCR has not produced any such waiver.   In light Judge Collyer's reason for staying the _Habeas_ Action (_i.e._, al-Qahtani's incompetence), it is highly doubtful that al-Qahtani has the legal capacity to effect such a waiver.   _See_ Minute Order, _al-Qahtani v. Obama_, No. 05 Civ. 1971 (D.D.C. April 20, 2012) ("continuing the stay in this case because Petitioner is currently incompetent and unable to assist effectively in this case").

worth a thousand words.  And perhaps moving pictures bear an even higher value.").

In any event, the Government's prior disclosures are "of limited legal relevance" in the context of FOIA Exemption 1. Azmy v. U.S. Dep't of Defense, 562 F. Supp. 2d 590, 598 (S.D.N.Y. 2008).  As the Court of Appeals has made clear, the "application of Exemption 1 is generally unaffected by whether the information has entered the realm of public knowledge." Halpern, 181 F.3d at 294.  There is a "limited exception" to this rule "where the government has officially disclosed the specific information the requester seeks."  Id.  This exception applies only when the requested information "(1) is as specific as the information previously released, (2) matches the information previously disclosed, and (3) was made public through an official and documented disclosure."  Wilson v. Cent. Intelligence Agency, 586 F.3d 171, 186 (2d Cir. 2009) (internal quotation marks and alterations omitted).  As CCR concedes, the Withheld Videotapes and Photographs were not previously disclosed.  Pl.'s Opp'n 9.  Therefore, the Government may properly withhold the records pursuant to FOIA Exemption 1.  See, e.g., Wolf v. Cent. Intelligence Agency, 473 F.3d 370, 378 (D.C. Cir. 2007) ("[T]he fact that information exists in some form in the public domain does not necessarily

mean that official disclosure will not cause harm cognizable under a FOIA exemption.").

Finally, we note that, contrary to CCR's speculative suggestion, there is no evidence that any of the Withheld Videotapes or Photographs depict illegal conduct, evidence of mistreatment, or other potential sources of governmental embarrassment. We have personally reviewed the FBI's individualized description of the FBI Videotapes.[14] See Third Hardy Decl. ¶ 2; Sealed Index. Having done so, we can confirm the Government's public representation that these records "do not document any abuse or mistreatment." Reply Mem. of Law in Further Supp. of the Government's Mot. for Summ. J. 4.

For the foregoing reasons, we conclude that the Government has satisfied its burden of establishing the applicability of FOIA Exemption 1, while CCR has failed to proffer any "tangible evidence" that this exemption should not apply. Carney, 19 F.3d at 812. In reaching this conclusion, we are mindful of "the uniquely executive purview of national security." ACLU, 681 F.3d at 76 (quoting Wilner, 592 F.3d at 76) (internal quotation marks omitted). As the Court of Appeals has cautioned, "it is bad law and bad policy to second-guess the

---

[14] Based on this review, we are satisfied that we do not have a "need to know" classified information from the Habeas Action. And yet even if we did have such a "need to know," we would be reluctant to overrule Judge Collyer's decision. Thus, we deny plaintiff's request to file a classified declaration for in camera review.

predictive judgments made by the government's intelligence agencies." <u>Id.</u> at 70-71 (quoting <u>Wilner</u>, 592 F.3d at 76) (internal quotation marks omitted).  And we decline to do so here.

### B.   The CIA Appropriately Issued a Glomar Response

"To properly employ the <u>Glomar</u> response to a FOIA request, an agency must 'tether' its refusal to respond to one of the nine FOIA exemptions -- in other words, a government agency may refuse to confirm or deny the existence of certain records if the FOIA exemption would itself preclude the <u>acknowledgment</u> of such documents." <u>Wilner</u>, 592 F.3d at 68 (internal quotation marks, citations, and alterations omitted).  As with FOIA responses more generally, "[i]n evaluating an agency's <u>Glomar</u> response, a court must accord substantial weight to the agency's affidavits, provided that the justifications for nondisclosure are not controverted by contrary evidence in the record or by evidence of bad faith." <u>Id.</u> (internal quotation marks and alteration omitted).

Here, the CIA contends that the existence of any responsive records must be withheld under FOIA Exemptions 1 and 3.  Culver Decl. ¶¶ 6-7.  With respect to Exemption 1, the CIA argues that either confirming or denying the existence of responsive records would necessarily reveal whether the CIA has ever had any interest in al-Qahtani or his affiliates, <u>id.</u>

¶¶ 36-38; whether the agency uses interrogation as a means of collecting intelligence, id. ¶¶ 47-48; and whether the CIA cooperates with other agencies, such as the DOD, for intelligence purposes, id. The CIA maintains that disclosure of this information could reasonably be expected to damage national security by, inter alia, aiding terrorist organizations and extremist groups in avoiding CIA surveillance and exploiting existing intelligence gaps, id. ¶¶ 37-39, and/or harming the United States' relationship with al-Qahtani's home country (i.e., Saudi Arabia), id. ¶ 42.

We are satisfied that the agency has provided sufficient detail to justify its invocation of FOIA Exemption 1.[15] See, e.g., Am. Civil Liberties Union v. Dep't of Defense, 752 F. Supp. 2d 361, 368 (S.D.N.Y. 2010) (upholding the CIA's Glomar response to a FOIA request seeking records related to Bagram detainees); Wolf, 473 F.3d at 376-77 (finding it "plausible that either confirming or denying an Agency interest in a foreign national reasonably could damage sources and methods by revealing CIA priorities, thereby providing foreign intelligence sources with a starting point for applying countermeasures against the CIA and thus wasting Agency resources").

---

[15]    Therefore, we need not reach the CIA's arguments concerning FOIA Exemption 3.

CCR's sole argument to the contrary is that "official acknowledgements" have already detailed the CIA's involvement in detaining and interrogating al-Qahtani. Pl.'s Opp'n 38-39; see also Pl.'s 56.1(b) ¶ 6. However, the referenced statements cannot satisfy the "strict test" for official disclosure, Wilson, 586 F.3d at 186, because they were not made by the CIA itself, see Culver Decl. ¶ 54 ("[N]o authorized CIA or Executive Branch official has officially and publicly confirmed (or denied) whether CIA personnel participated in the interrogations of al Qahtani at Guantánamo Bay or provided details regarding how, and what type, of information other agencies share with CIA regarding detainees at Guantánamo Bay."); see also Wilson, 586 F.3d at 186-87 (stating that "the law will not infer official disclosure of information classified by the CIA from (1) widespread public discussion of a classified matter, (2) statements made by a person not authorized to speak for the Agency, or (3) release of information by another agency, or even by Congress" (internal citations omitted)). Furthermore, the official acknowledgments are not as specific as the classified information at issue here -- namely, the existence or nonexistence of videotapes, audiotapes, and photographs of al-Qahtani from the period 2002 to 2005. Therefore, we find that the CIA's Glomar response is proper and sufficient.

## CONCLUSION

For the foregoing reasons, CCR's motion for partial summary judgment (Dkt. No. 17) is denied and the Government's cross-motion for summary judgment (Dkt. No. 36) is granted.

Dated:    New York, New York
          September 12, 2013

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

### Attorneys for Plaintiff

Lawrence S. Lustberg, Esq.
Benjamin Z. Yaster, Esq.
Gibbons P.C.
One Gateway Center
Newark, NJ 07102-5310

Sandra L. Babcock, Esq.
Center for International Human Rights
Northwestern University School of Law
357 East Chicago Avenue
Chicago, IL 60611

### Attorneys for Defendants

Tara M. La Morte, Esq.
Emily E. Daughtry, Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street
New York, NY 10007