D93TCENA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CENTER FOR CONSTITUTIONAL
RIGHTS,

                    Plaintiff,

             v.                              12 CV 135 (NRB)

DEPARTMENT OF DEFENSE, et al.,

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        September 3, 2013
                                        10:30 a.m.

Before:

                    HON. NAOMI REICE BUCHWALD,

                                        District Judge

                           APPEARANCES

GIBBONS P.C.
     Attorneys for Plaintiffs
BY:  LAWRENCE LUSTBERG
     BENJAMIN YASTER

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:  EMILY DAUGHTRY
     TARA LaMORTE
     Assistant United States Attorneys

ALSO PRESENT:  MEGAN WEIS
               SHAYANA KADIDAL

D93TCENA

```
 1              (In open court)

 2              LAW CLERK:  This is the Center for Constitutional

 3    Rights versus Department of Defense, 12 Civ. 135.

 4              Is the plaintiff present and ready to proceed?

 5              MR. LUSTBERG:  Yes, Lawrence Lustberg from Gibbons

 6    P.C. on behalf of plaintiff Center for Constitutional Rights.

 7              LAW CLERK:  Is the defendant present and ready to

 8    proceed?

 9              MS. DAUGHTRY:  Yes, Emily Daughtry, assistant United

10    States attorney for the government.

11              MS. LaMORTE:  Tara LaMorte, assistant United States

12    attorney for the government.

13              MS. DAUGHTRY:  Your Honor, we also have Megan Weis,

14    who is an associate deputy general counsel of the Department of

15    Defense.

16              THE COURT:  She was hiding back there.

17              All right.  I thought that a useful structure this

18    morning would be to give the Center for Constitutional Rights

19    the opportunity to respond to the government's reply

20    memorandum, since they sort of got the last written word.

21              As you know, I gave you quite a number of extra pages

22    over my usual page limit.  You should assume with confidence

23    that your papers have been read carefully, so pure repetition

24    would not be particularly valuable.  But I think, as I say, a

25    good way to begin is to let the Center sort of have a surreply
```

D93TCENA

1    and then I will give the government a sur surreply.

2              MR. LUSTBERG:  Thank you, your Honor, may it please

3    the Court.  I absolutely will not repeat what's in the

4    voluminous papers here.  I think the Court has available to it

5    a pretty extensive record and one in which the parties were

6    fairly well engaged with each other in terms of going back and

7    forth, so hopefully you have the benefit of all of our thinking

8    on most of the issues.

9              I'm more than happy to respond to the government's

10   reply.  I think it bears noting that there's really a few

11   themes that pervade all of what we talk about here.  But before

12   I get into those, I'm sure that your Honor is well aware of the

13   background of all this that Mr. al Qahtani was detained and

14   questioned.

15             THE COURT:  I did read the coverage in the Washington

16   Post and Time magazine.  Those were six or eight pages each.

17             MR. LUSTBERG:  Right.  And then what else was in our

18   appendix, as the Court may recall, is a lot of the official

19   government-type publications, various reports from Congress and

20   from the administration, press releases from the Department of

21   Defense that stand for the proposition largely -- and we relied

22   upon this in different respects at different times throughout

23   our papers -- for the fact that a lot of the information that

24   we're seeking is in a sense -- or what I should say is the

25   government's response to our request for that information

D93TCENA

1    really turns on the logic or plausibility of particular

2    arguments that they make.

3            Let me back up.  There's a fundamental, in some ways,

4    disconnect between the two sides.  Of course we argue that the

5    Freedom of Information Act is very important salutary remedial

6    legislation that should be liberally construed to effectuate

7    its purposes, that is to say openness in government is a good

8    thing, so therefore the exemptions to FOIA should be narrowly

9    construed.  The government, as always occurs, and we have all

10   done a lot of these cases, typically responds by saying no, you

11   need to balance the public interest in keep things secret with

12   the purposes of the Freedom of Information Act.  And they

13   always emphasize in these contexts, that is the national

14   security context in particular, that great deference should be

15   paid to the statements of government officials in the various

16   declarations that have been submitted.

17           As the dance goes, we then cite those cases that stand

18   for the proposition that deference is one thing and

19   acquiescence is another, and that under the Freedom of

20   Information act this Court has a very important role to play,

21   and it should perform that role by evaluating the declarations

22   that the government has submitted both for their sufficiency --

23   and that's very important in this case, as to whether or not

24   what they have said is enough for your Honor to to go on -- and

25   with respect to their legal adequacy.

D93TCENA

1            We make both of those sets of arguments throughout our

2     papers.  But at the end of the day, all of that deference that

3     is supposed to be paid to government officials in the national

4     security context comes down to really two words that we all

5     agree on, which is are there statements about the potential

6     evils that would come about should the materials we wish be

7     disclosed to us, are their arguments logical and plausible.

8            Interestingly, this Court, of course, has presumably a

9     great deal of experience with the word "plausible," which when

10    we first started doing FOIA litigation wasn't such a term of

11    art, but after *Twombly* and *Iqbal* is now a part of all pleading.

12    And we know that the plausibility means something; it's not

13    something that is just satisfied by any old statement.  And

14    largely our arguments today and our papers go to the

15    plausibility of the government's arguments with regard to each

16    of the issues.

17           Now I would like to focus, as the government does in

18    its papers, upon two of those issues, one of them is the

19    exemption one claims, and the other is the exemption 7(a)

20    claims.  And just to remind the Court what we're talking about

21    here in terms of actual materials, there's no question but as

22    to the fact that there are materials out there that satisfy or

23    that respond to the request that CCR has made.  There are 53

24    videotapes of Mr. al Qahtani in his cell and interacting with

25    DOD personnel.  And that's as much as we know about those

D93TCENA

1    items.  We understand that the government has submitted an in

2    camera -- made an in camera ex parte submission that may

3    describe them in greater detail.  Obviously we do not have

4    access to that and don't know what is said there, and I will

5    have a little more to say about that, perhaps, later.  But they

6    do tell us in their most recent submission that those items --

7    that the description of those do not depict any abuse of

8    Mr. al Qahtani.  And that's important because it goes to some

9    of our logic and plausibility concerns.

10            In addition to those 53 videotapes, there are six mug

11   shot photos of Mr. Albany that the government quite frankly --

12   and particularly when you asked me to respond to their last

13   submission -- hardly discusses, and at least as I read it,

14   doesn't vigorously oppose our obtaining.  There's not a lot of

15   discussion of how those -- the release of those six mug shot

16   photos would fulfill any of the purposes that the government

17   sees for non-disclosure, or more to the point, any of the

18   elements of the particular exemptions at issue.  Then there's a

19   video of two forced cell extractions which we'll discuss and

20   then two videos of intelligence debriefings.

21            I just lay that out by way of sort of a structure of

22   what it is that we're looking for.

23            So let's talk about exemption one.  The Court is well

24   aware of the elements of exemption one, which provides that

25   materials that are properly classified in the interest of

D93TCENA

national security, hereunder executive order 13,526, need not

be turned over so long as they were classified, as I said, were

done under the control or owned or produced by the government,

which they were here, in which the classification authority

determined that disclosure would result in damage to national

security, and describes it in appropriate detail that it has to

fall within the eight categories.  Here there are three of them

at issue.  It can't be the purpose of the government's actions

in not disclosing them cannot be to conceal violations of law

or to prevent embarrassment.  And that's important to

atmospherics to this case, although we don't argue it as our

primary basis for disclosure.

           Here I would like to address the particular concerns

that you asked me to -- that the government raises and attempt

to persuade your Honor that they don't satisfy these standards.

           First, the government expresses the concern that if

Mr. -- if these various images are disclosed, that they will

reveal that Mr. al Qahtani is detained at Guantanamo and that

he and his family will therefore be subject to reprisals.  We

contend, as your Honor I think knows, and I would respond to

their last submission in this regard by saying that simply is

not logical or plausible.  And it is not logical or plausible

for several reasons.

           First, many of these records -- and this really is

first -- say absolutely nothing that would cause anybody to be

D93TCENA

1    concerned about reprisals, or to put it another way, the

2    concern that they would reveal that Mr. al Qahtani is

3    cooperating with the authorities is really misdirected with

4    regard to those images.  That is, what about the mug shots

5    shows that he's cooperating?  What about his cell behavior

6    would show that he's cooperating so therefore he should be

7    concerned about reprisals?  Many of these images say absolutely

8    nothing, at least as insofar as they're described to us.  And

9    we're reliant upon those descriptions for the purpose of

10    today's proceedings.  None of them have anything to do with

11    cooperation and ought not give rise to any concern that there

12    would be reprisals against him for cooperating with the U.S.

13    authorities.

14           Even much more to the point, the Department of Defense

15    itself has made a huge amount of information about

16    Mr. al Qahtani publicly available beyond the Time article and

17    the Washington Post article that your Honor alluded to.  We

18    know from government disclosures that Mr. al Qahtani is in

19    captivity at Guantanamo.  We know when he was captured.  We

20    know how.  We know a great deal about the mistreatment to which

21    he was subjected.  And most significantly, in a Department of

22    Defense release that's one of our exhibits and in other

23    materials that we provided to the Court, we know that the

24    government has been saying that he's been cooperating with them

25    and that they got valuable intelligence from him.

D93TCENA

1        We don't necessarily accept that as truth, but it's

2   incredibly disingenuous for the government to make available to

3   the world facts that would indicate that Mr. al Qahtani

4   cooperated and then say they shouldn't release additional

5   information to us, whether or not that information depicts his

6   cooperation, because it will reveal that he's cooperating and

7   there could be reprisals against him and his family.  If when

8   were reprisals -- and by the way, there's been no evidence that

9   there has been, notwithstanding those releases by the

10  government, then -- well, let me back up.  If anybody was going

11  to do it, they would know.  If there was going to be reprisals,

12  they could do it based upon the information that the government

13  itself made available.

14       And let me, in that regard, respond directly to

15  something that the government says in its final submission.

16  One of the things that they take us to task for is they say

17  we're essentially arguing that the government has waived its

18  right to claim this exemption with regard to these materials,

19  and that there is no such waiver because these materials

20  themselves have never been put out there in the public for

21  public consumption.

22       Our argument here is absolutely -- and it's very

23  important to me that your Honor understands the argument.

24  We're not arguing waiver.  I argued waiver before courts in

25  FOIA cases before.  It is not a waiver argument.  It could not

D93TCENA

1    be.  And the reason it can't be is because they're right, these

2    particular items are not in the public sphere.  But the fact

3    that the government has revealed the facts that it has already

4    is evidence that goes to whether their claim that we all should

5    be concerned -- that your Honor should be concerned about

6    reprisals is a logical and plausible claim.

7           I think, your Honor, the take away from all that is

8    that prism of logic and plausibility is the prism through which

9    you should examine each of the government's arguments.  If

10   necessary, you can examine the images yourself in camera.  The

11   law is pretty clear that in camera review is no substitute for

12   adequate showing by the government and so forth, but in

13   assessing logic and plausibility, it is important to look at

14   them to see whether it makes sense, it makes good common sense

15   in light of the claim that the government has made, this first

16   claim being that there will be reprisals for Mr. al Qahtani's

17   cooperation.

18          The second claim that they make is that releasing the

19   photos will dissuade current and future detainees from

20   cooperating.  The problem with that argument is that the

21   government has in the past already released photos of

22   detainees, and in our papers we have provided those to the

23   Court.  They have allowed both the AP and the Red Cross to

24   photograph detainees.  They have declassified, in the context

25   of other litigation and otherwise, other photos of detainees,

D93TCENA

1   and most significantly, in some ways Mr. al Qahtani has

2   consented.

3          And so to the extent -- and that consent is important

4   here because --

5          THE COURT:  How could you argue that?

6          MR. LUSTBERG:  Pardon me?

7          THE COURT:  How could you argue his consent was given?

8   As I understand it, you've brought the habeas proceeding to a

9   halt because he is incompetent.

10         MR. LUSTBERG:  A couple of aspects of that, your

11  Honor, that you should know.  His consent was well before all

12  those applications with regard to competency.

13         THE COURT:  If he really consented to this request,

14  why didn't you get it in writing?

15         MR. LUSTBERG:  We -- there's a couple of reasons that

16  we didn't.  We certainly can.

17         THE COURT:  Now you can't.  I mean I couldn't take a

18  plea from him.  I couldn't take -- there can't be a knowing

19  waiver at this point or knowing consent.

20         MR. LUSTBERG:  I think that's right today.  That was

21  not right as of the time that he consented.  And Ms. Babcock,

22  who submitted a certification to that effect and met with him,

23  was persuaded that that was a knowing and voluntary consent to

24  going forward.

25         THE COURT:  I'm not questioning her honesty, but you

D93TCENA

 1    can't -- you do have the problem that we all recognize of his

 2    inability now to give consent.  And moreover, I think the other

 3    issue would be that at the time that you say he gave consent

 4    I'm not sure that he knew what he would be consenting to.

 5              MR. LUSTBERG:  Respectfully, your Honor, I was there

 6    for one of the interactions, and it's not appropriate -- it may

 7    not be appropriate for me to act as a witness in any event, but

 8    the particular claim of competence that was made in the course

 9    of the habeas proceeding and that, you're correct, has caused

10    it to come to a fundamentally halt in a stay situation, was

11    based upon the fact that he was unable to assist with his own

12    defense and could not understand the nature of those

13    proceedings against him.

14              The question of his understanding that we were seeking

15    the release of information regarding his treatment was a

16    different thing.  That was fully explained to him, and counsel

17    believed that he consented at that time knowingly and

18    willfully.  There's really no law that requires that he do so

19    in person.

20              THE COURT:  There's actually also no law that -- his

21    consent would be a plus for you, but it is not a requisite, I

22    think we all agree.

23              MR. LUSTBERG:  Absolutely.  It goes -- again, it's a

24    single data point that goes to the logic and plausibility of

25    the government's concerns.  It's more pertinent to some of

D93TCENA

their arguments than others.  So for example, when they argue

their respect for the Geneva Conventions and the notion that

the United States should be viewed as in compliance with the

Geneva Conventions so as not to create a public curiosity of

Mr. al Qahtani, his consent is somewhat significant to that,

and perhaps not as significant as evaluating the logic and

plausibility of that argument given the government's conduct in

this case, which seems to be so far afield from what the Geneva

Contention intended.  So you're right, there are other data

points that your Honor can consider in deciding this matter.

       But nonetheless, his consent is a data point, and the

amount of weight that your Honor puts on it, given the other

circumstances, including the claim of incompetence and the fact

that it was a third-party consent.

       And on the other side, to be fair, one of the things

that the government argues is that he refused to consent to be

photographed by the ICRC.  True.  Very different circumstances.

We are not in a position to comment on why he did that.  But

the fact that he didn't want the ICRC to take a picture of him

to send to his family doesn't really bear on, respectfully,

whether he knowingly and voluntarily consented to the

treatment, the facts pictured regarding the treatment that he

endured being made public.

       THE COURT:  Go on.

       MR. LUSTBERG:  One of the issues I would like to

D93TCENA

1    address is the contention in the government's declarations that

2    the release of certain of these pictures would endanger the

3    lives and physical safety of American citizens and allies

4    because in the past violence has erupted when other photos were

5    disclosed.  And the government points to photos from Abu

6    Ghraib, abuse of the Koran, of a Marine urinating on Taliban

7    corpses and the like.

8            But in that most recent submission, the submission

9    that your Honor has asked me to respond to, the government

10   specifically characterizes the ex parte declaration that they

11   submitted to the Court -- and again, we don't know what it says

12   other than that characterization -- as one that does not depict

13   abuse of Mr. al Qahtani.  That being so, it's hard to

14   understand why those particular photos, or at least those

15   photos on those videos that do not depict abuse, would cause

16   the kind of response that the government cites in particular

17   response to really outrageous atrocities.

18           So the government is left to argue well, who knows how

19   they could be spliced or edited, and they could be spliced or

20   edited by somebody in a way that would cause exactly that kind

21   of response and thereby endanger U.S. troops and allies.  But

22   that's a logic that fails the logic and plausibility argument

23   because it sweeps way too broadly.  People could make up

24   pictures and put them out there.  We see video games that are

25   unbelievably realistic.  Any picture, any image could be

D93TCENA

 1    tampered with, could be altered in a way to make it look more

 2    outrageous than it is.  So that theory has essentially no

 3    limiting principle.  It not only would preclude the release of

 4    any photograph, but it would preclude the release of tons of

 5    information that could be made to appear to be something that

 6    it isn't, a skill that frankly my teenage son has mastered very

 7    well when it comes to, for example, parents' signatures on

 8    report cards.  It's not hard.  You should see how well my kids

 9    could forge my signature.

10         THE COURT:  I was hoping to see how good the report

11    cards were.

12         MR. LUSTBERG:  If the report cards were good, they

13    would not have to forge my signature.

14         I have just a quick note on the ex parte submissions.

15    We agree that in many cases ex parte submissions are

16    appropriate.  There's obviously a cost to ex parte submissions

17    in the sense that it denies us the opportunity to really

18    respond to the arguments that are typically contained, at least

19    even if they're factual, between the lines of such submissions,

20    and it deprives the Court of the opportunity to subject any

21    such contentions to the adversarial process.  And that's why

22    the standard is that ex parte submissions by the government in

23    support of FOIA exemptions should only be allowed where quote,

24    unquote, absolutely necessary.

25         Here, your Honor, we have contended that it's just

D93TCENA

 1   unfair, given the fact that we ourselves were not permitted to

 2   make an ex parte submission, or a sealed submission at least,

 3   ourselves.  As the Court --

 4           THE COURT:  Because you were barred by another judge.

 5           MR. LUSTBERG:  We were barred by another judge based

 6   upon her reading of FOIA, which was really not before her, and

 7   based on her assessment of this Court's quote, unquote, need to

 8   know.

 9           We think it would be appropriate for your Honor,

10   sitting as the Freedom of Information Act in this case, to take

11   another look at that ruling.  She's not really construing the

12   protective order before her, as to which I would never say this

13   Court should second guess that at all, but as to her assessment

14   of your need to know, I think that's the kind of thing that you

15   can consider.

16           THE COURT:  She assessed under her protective order

17   what you were permitted to do with the information that you

18   received under the protective order and said you could not rely

19   on that in this case.  So I think Judge Collyer --

20           MR. LUSTBERG:  Yes, Judge Collyer.

21           THE COURT:  -- was construing her own protective

22   order.

23           MR. LUSTBERG:  Respectfully, Judge, if you read her

24   ruling, what her ruling is is that that is so because she

25   doesn't see any possible need to know that this Court would

D93TCENA

1      have with regard to our arguments.  That is her ruling in the

2      record, you have that.  If you read her ruling, it's not really

3      where she's looking at the protective order and construing

4      certain language, what she is saying is in a Freedom of

5      Information Act case this Court would have no need to know.

6      And that might be true in some cases.

7              THE COURT:  Let me just share something with you and

8      maybe it will -- well, on one level it will give you comfort,

9      on another other level, probably not.

10             I was not at work last week.  At least I was not in

11     the office, I was at work in substance.  I also am a commuter

12     and do a great deal of my reading on the train.  Consequently,

13     I do not walk out of the office with ex parte submissions.  I

14     surely do not leave with classified documents.  So actually I

15     was unable or constrained to read all the papers in this case

16     without seeing either the ex parte submission or seeing the

17     classified submission.  I saw them for the first time today.

18     So actually I can attest that I could evaluate this case and

19     did without seeing that stuff.  So I actually do have a split

20     brain on that.  So that, as I say, it may give you comfort, it

21     may not, but I didn't find it essential.

22             MR. LUSTBERG:  I understand.  Just one other point

23     with regard to the exemption one argument to respond to the

24     government's most recent submission, and that has to do with

25     the forced cell extractions.  Because clearly, those are on a

D93TCENA

<table>
<tbody>
<tr><td>1</td><td>different -- it's a different sort of thing than mug shots on</td></tr>
<tr><td>2</td><td>the one hand and the 53 images of Mr. al Qahtani in his cell</td></tr>
<tr><td>3</td><td>and quote, unquote, interacting with DOD personnel on the</td></tr>
<tr><td>4</td><td>other.  At least one court has held, and it's Judge Bates, in</td></tr>
<tr><td>5</td><td>the cases that -- series of cases that were cited by both</td></tr>
<tr><td>6</td><td>parties, that those four cell extractions are properly withheld</td></tr>
<tr><td>7</td><td>under exemption one.</td></tr>
<tr><td>8</td><td>          The record that we have created, though, your Honor,</td></tr>
<tr><td>9</td><td>we think required this Court to take a fresh look at those</td></tr>
<tr><td>10</td><td>issues.  In particular, in the record before you are lots and</td></tr>
<tr><td>11</td><td>lots of previous disclosures about these so-called FCEs,</td></tr>
<tr><td>12</td><td>including the procedures that are used, photographs that the</td></tr>
<tr><td>13</td><td>Department of Defense has released regarding them, and other</td></tr>
<tr><td>14</td><td>information regarding forced cell extractions.</td></tr>
<tr><td>15</td><td>          It's in light of those that we ask this Court to</td></tr>
<tr><td>16</td><td>assess the logic and plausibility of the government's arguments</td></tr>
<tr><td>17</td><td>that these particular FCE videotapes, or this one videotape</td></tr>
<tr><td>18</td><td>with two instances, should not be disclosed.  And we would also</td></tr>
<tr><td>19</td><td>ask that this Court take a good look at the particular</td></tr>
<tr><td>20</td><td>government rationale that it offers for not disclosing the FCE</td></tr>
<tr><td>21</td><td>videotape.  Really they talk about two things, one is that it</td></tr>
<tr><td>22</td><td>would encourage future detainees to resist forced cell</td></tr>
<tr><td>23</td><td>extractions because if these are revealed then it would -- one</td></tr>
<tr><td>24</td><td>would know that in resisting you may become a hero to the world</td></tr>
<tr><td>25</td><td>when that becomes public or something like that.</td></tr>
</tbody>
</table>

D93TCENA

1          But it's an extraordinary argument, because what it

2     counts on is the idea that when somebody is deciding whether to

3     resist being taken from their cell, that what they're going to

4     be resisting for is not because they don't want to leave their

5     cell, not because they may hate their captors or whatever the

6     other reason is, not because they're scared or some other

7     reason, it's just because sometime down the road, after years

8     of Freedom of Information Act litigation or whatever, that

9     those particular videotapes would be revealed to the public.

10          It's really -- it's almost absurd, but certainly

11    doesn't satisfy a logic and plausibility, and particularly a

12    plausibility standard, any more than does the government's

13    other contention with regard to this, which is if this Court

14    were to require these videotapes to be disclosed, then it, the

15    government, would cease videotaping them, or would tempt the

16    government, I take it, to cease videotaping them in the first

17    place.  That is, the government says you should not order these

18    disclosed because if you do, then the Department of Defense may

19    take the position ultimately that it's a bad idea to videotape

20    them, even though it's in the public interest, they say, to do

21    so both as a training matter, as a matter of documenting what

22    occurred, and for other salutary public reasons.  That strikes

23    me as an argument that is a little scary to hear it made, but

24    in any event, certainly doesn't pass the logic and plausibility

25    test.

D93TCENA

1          I want to spend a few minutes on the exemption 7(a)

2     issue, because that's the other issue that the government

3     spends a good deal of time on in their final submission.  As

4     you know, your Honor, exemption 7(a) pertains to records or

5     information that is compiled for law enforcement purposes.

6     That's prong one.  And prong two is that production of which

7     could reasonably be expected to interfere with law enforcement

8     proceedings.

9          We do not dispute, so that maybe this makes things a

10    little easier, the first prong.  We do dispute the second

11    prong.  That is, we do not dispute these materials were

12    gathered for law enforcement purposes.  There's a dispute

13    between the parties, a legal dispute, as to what has to be

14    particularized here.  But I want our position to be clear, we

15    agree with the government that a document-by-document showing

16    of whether a particular -- any one of those documents could

17    reasonably be expected to interfere with law enforcement

18    proceedings is not necessary, that it could be done, as the

19    government says, by categories.

20         But that doesn't mean that the showing can be a

21    conclusory one, that is to say, for example, let's take the mug

22    shots, or better even than that, let's take the 53

23    pre-interrogation videos.  The government says that those are

24    videos of, quote, activities in Mr. al Qahtani's cell as well

25    as interaction with DOD personnel.  That's the description that

D93TCENA

they provided.  That's the description upon which the Court is

asked to rely in deciding whether their release could

reasonably be expected to interfere with law enforcement

proceedings.

It's way too conclusory.  The notion that those videos

with that description could somehow interfere or reasonably be

expected to interfere with law enforcement proceedings is --

the logic of it is elusive.  The plausibility of it is

impossible to ascertain.

So in particular, what they say is it might bear on

any of Mr. al Qahtani's claims or defenses.  When I say "they

say that," your Honor, that's in their brief.  We have not seen

any declarations from anybody that says that the reason that

the way in which the release of those 53 videos and those mug

shots, for example, would -- that the way in which they would

interfere with ongoing law enforcement proceedings is because

they would bear on any claims or defenses.  The government says

it in their brief, and what they say is that, for example, it

might bear on his claims of voluntariness with regard to

various statements that he made.  The Court will recall that

statement from their brief.

And their concern is that what will happen is he'll

get a heads up that that is -- from something about that, and

will tailor his arguments to that evidence.  Leaving aside what

the evil is with tailoring one's arguments to actual evidence

D93TCENA

1    in a case, certainly a disturbing notion that there's something

2    wrong with that, in this case, Mr. al Qahtani has, since the

3    beginning of his habeas, at least, has clearly challenged the

4    voluntariness of his statements.  So it's not like he's

5    creating arguments as a result of what's on videotapes that he

6    hasn't seen.  And so that argument seems to me to be one that,

7    again, failed the logic and plausibility test, as does the

8    argument that they make that somehow the evidence could be

9    manipulated by the defense.

10        We're not asking for originals.  The government would

11   retain the original videotapes, audio tapes, mug shots,

12   whatever.  So to the extent that Mr. al Qahtani or his defense

13   team somehow wanted to quote, unquote, manipulate the evidence,

14   it would be literally impossible to do.  The claim, which is in

15   their declarations, is -- maybe I was too harsh when I said in

16   one of our briefs that it was silly, but it strikes me as

17   completely defying common sense, and common sense, in a way, is

18   what the logic and plausibility standard is all about.

19        Equally bereft of force is the government's argument

20   that the release of these materials would somehow influence

21   military commission members should this matter ever proceed to

22   a hearing.  That assumes that there would be a hearing,

23   something that, as the Court knows, didn't happen the last time

24   because the convenor refused to convene a military commission

25   because of the torture to which Mr. al Qahtani has been

D93TCENA

1    subjected.  But even assuming there was a military commission,

2    it assumes that commission members, who are not like lay

3    jurors, would not follow the instructions of the Court to only

4    consider the evidence that was before them, for example.  It

5    assumes they would be prejudiced by these materials even after

6    themselves having been subjected to perhaps the Time magazine

7    article or the Washington Post article or any other materials

8    about this case.  It is a claim that is like the government's

9    other claims in this matter, which is no matter how much

10   deference you pay to the declarations before you simply doesn't

11   pass a common sense test.

12           The main government argument in their final submission

13   with regard to this issue is that it would -- that providing

14   these materials to Mr. al Qahtani, to the world, would provide

15   him the with, quote, earlier or greater access to the materials

16   than the rules of whichever proceeding, whether federal or

17   criminal rules or military commission rules, would provide.

18   Again, that has to be viewed in somewhat in the context of the

19   sense that his defense team, although we can't use those

20   materials, has seen some, albeit not all, the materials in the

21   past.

22           But their claim is that's an illogical argument for us

23   to make because this would be to the world.  But the world

24   doesn't gain anything by earlier or greater access.  That

25   argument is completely out of context and just doesn't work.

D93TCENA

1    And it can't be that any time somebody gets access to materials

2    that would not be allowable under the appropriate rules of

3    criminal procedure, whether for the military or in civilian

4    courts, it necessarily means that there's an interference with

5    law enforcement proceedings.  This Court has to assess whether

6    the release of these materials, insofar as they have been

7    described to you, would have that specific harm and how.

8           Finally, there's a good deal of argument in the papers

9    with regard to whether in the context of evaluating an

10   exemption 7(a) claim you can also consider the national

11   security arguments that were made under exemption one.  We

12   believe that that argument is precluded by the Second Circuit's

13   decision in *ACLU v. DOD*.  But even if it isn't, you heard our

14   arguments as to why those particular national security claims

15   don't pass the logic and plausibility tests.

16          Your Honor, there obviously are other arguments made

17   with regard to privacy with regard to Glomar.  I think with

18   regard to those we don't think there's anything new in the

19   final submission, so we rely on our papers.  And I appreciate

20   your Honor taking the time to hear me out this morning.

21          THE COURT:  Now for the sur surreply.

22          MS. DAUGHTRY:  Good morning, your Honor, Emily

23   Daughtry, assistant United States attorney representing the

24   government in this case.

25          Your Honor, I want to respond to focus my comments on

D93TCENA

 1  the comments that Mr. Lustberg made, but I would just start by

 2  noting for the Court that all of the videotapes and photographs

 3  in this case are being withheld under exemption one and

 4  exemption six, a subset of them are being withheld under

 5  exemption 7(a), and that is just the 53 FBI videotapes.  Those

 6  are the only one that we're relying on exemption 7(a) for.  So

 7  what that means, of course, is if the Court finds for the

 8  government on exemption one, then you need not reach exemption

 9  7(a) or 6, same for exemption 6.

10          So with respect to the harms that are laid out in the

11  government's declarations, Mr. Lustberg has laid out the Second

12  Circuit standard, I think we all agreed on it, is whether the

13  harms are logical or plausible.  And what that means is not

14  whether the plaintiff agrees with them, it doesn't necessarily

15  mean that the Court, in making an initial determination, would

16  also come to the same conclusions about the harm to national

17  security, what it means is:  Has the government articulated a

18  harm to national security?  The government, the executive

19  branch, which is uniquely qualified and placed to make

20  determinations about national security, has the government

21  articulated a logical or plausible explanation for the harm to

22  national security?

23          And here we have four separate declarations, three of

24  them submitted publicly, one ex parte, that describe these

25  harms, and each explanation of harm in these declarations

D93TCENA

         1    provides an independent reason that exemption one applies.  And

         2    each explanation alone, we would submit, is sufficient to

         3    uphold the government's assertion of exemption one.  And these

         4    are not only logical and plausible, but indeed compelling.  And

         5    I will go through and maybe address some of the points that

         6    opposing counsel pointed out.

         7            So with respect to the declarations submitted by

         8    Admiral Woods, this is the declaration where Admiral Woods

         9    essentially laid out that there is a harm to national security

        10    from the release of detainee photographs, because detainee

        11    photographs tend to show cooperation, and that cooperation in

        12    turn can lead to reprisals, and those reprisals in turn can

        13    lead to other detainees not being willing to speak with

        14    government officials or have a chilling effect on cooperation

        15    by other detainees, which in turn harm the government's ability

        16    to collect intelligence.

        17            And what I think is really key here is that the

        18    government has this policy for classifying photographs because

        19    there's a unique power to images that is different from a

        20    written description.  And images, as the Court in the *AP* case

        21    which we cite in our brief noted, images have a power beyond

        22    written description in that they can confirm the identity in a

        23    way that a mere name even cannot, given that names can

        24    sometimes be common, and they also just provide the type of

        25    visceral proof that some people need in a way that written

D93TCENA

1    descriptions don't.

2              And I would point out that in addition to the *AP* case

3    there's another case in this district, the *Azmy* case, which has

4    also accepted this rationale.  Indeed, in that case the court

5    upheld the government's withholding of an official

6    identification photograph of a detainee despite the fact that

7    that detainee's name was known and that other photographs of

8    that detainee had been released.

9              Another thing I also wanted to point out is counsel

10   mentioned there was no evidence of reprisals.  There is in fact

11   in the Woods' declaration in paragraph 24, Admiral Woods

12   affirms that experience has shown that public disclosure of a

13   cooperative relationship between a source and the government

14   has indeed led to reprisals against the source.  So this is not

15   a speculative concern, this is something that the original

16   classification authority in this case has made a judgment based

17   on past government experience.

18             In addition, with respect to the harms outlined in the

19   declarations submitted by General Horst, General Horst is the

20   chief of staff for the U.S. Central Command, recently retired,

21   I understand, but up until recently responsible for all of U.S.

22   military personnel in the Middle East and Central Asia,

23   including Afghanistan.  And I think what is incorrect about

24   counsel's understanding of what General Horst said is that only

25   if the particular videotapes and photographs that are being

D93TCENA

1   withheld here showed some sort of abuse or mistreatment, then

2   that would be the only reason that this potential harm could

3   take place.  And that is simply not the case, and that is not

4   what General Horst said.

5       The examples that he provided in his declaration show

6   also the general volatility of the region, but he does say

7   specifically in paragraph 12 that past experience has shown

8   that images of detainees interacting with DOD personnel have

9   incited violence and have led to situations that have even led

10  to the deaths of individuals.  And so this, again, it is not

11  conclusory, it is not speculative, it is based on past

12  experience and it's the judgment of an original classification

13  authority which is responsible for the safety of those

14  individuals.

15      I would note that counsel also failed to mention

16  another assertion of harm that is in the Lietzau declaration.

17  William Lietzau was I think until recently the deputy assistant

18  secretary of defense for detainee policy.  And another

19  explanation of harm that he provided in his declaration was

20  that the release of images and of detainees could lead to

21  unauthorized communications between detainees and others out in

22  the field.  And indeed, this could include coded messages.  And

23  he specifically says that detainees have attempted to

24  communicate with Al Qaeda in the past.  And this is not based

25  on speculation, this is based on past experience.

1          And I would also note that a district court in the

2     district of DC in the ICB case accepted both his rationale and

3     the rationale provided in General Horst's declaration in

4     upholding the government's withholding of videotapes of

5     detainees.  In that case, specifically in that case there were

6     videotapes of forced cell extractions.

7          In addition, Mr. Lietzau also outlined another harm to

8     national security that could come about from the release of

9     these videotapes and photographs, and that is that the

10     long-standing policy of the United States government is to

11     protect detainees from public curiosity consistent with the

12     Geneva Conventions.  And to the extent that the government

13     releases these photographs, that could lead our allies and

14     partners to understand that we no longer are able to protect

15     detainee photographs consistent with the Geneva Conventions,

16     and that could have a negative effect on our foreign relations.

17     And that, as your Honor knows, is one of the bases for

18     classifying information as well, as it could have a negative

19     effect.

20          THE COURT:  How did The New York Times get a

21     photograph of Mr. al Qahtani?

22          MS. DAUGHTRY:  I don't know that, your Honor, but I do

23     know that the United States did not release that photograph.

24          With respect to the FCE videotapes in particular, I

25     would just note that in addition to the harm that is set forth

D93TCENA

in the Lietzau declaration, which I will come back to in a

second, that General Horst in his declaration also specifically

affirmed that the FCE -- the FCE videotapes would be

particularly likely to cause the types of harm that he outlines

in his declaration because they depict the forcible interaction

between the U.S. military and detainees.  So the FCE videotapes

in particular have a particular power do this.

          And with respect to counsel's concerns about the harms

outlined in the Lietzau declaration with respect to the FCE

videos, again, the standard is not whether counsel agrees with

it, the standard is whether it is logical or plausible.  Is it

logical or plausible that detainees, knowing that videotapes of

these events will be released publicly, would want to show

their continued resistance to the United States by struggling

more, being more violent, and endangering both themselves and

DOD military personnel.  An original classification authority

whose job it is to be in charge of the detainees at Guantanamo

have made the determination that is a concern, and that is

logical and plausible and deserves the Court's deference.

          I think I have addressed all of the exemption one.

There is also the classified declaration that we submitted

which I just wanted to clarify -- I know if you looked at that

briefly today -- only addresses the harms from releasing the

two debriefing videotapes.  Unless you have any particular

questions about exemption one, I can move on to exemption 7(a).

D93TCENA

         1                  THE COURT:  You may move on.

         2                  MS. DAUGHTRY:  So with respect to 7(a), I think it

         3       would be useful to sort of back up for a minute and look at the

         4       big picture and just remind the Court what exemption 7(a) is

         5       designed to protect.  And this is one of several exemptions for

         6       law enforcement information, but it is the exemption that

         7       protects an ongoing investigation before an investigation has

         8       come to trial.

         9                  And that is the situation that we have here, and many

        10       of the harms that we have outlined in other declarations and

        11       discussed in our briefs are indeed exactly the type of harms

        12       that this particular exemption was designed to protect against.

        13       So for example, to the extent that counsel says that it

        14       doesn't -- is not legitimate that the government would be

        15       concerned about earlier or greater access to these

        16       investigative materials than they might be entitled to in a

        17       criminal trial or in a habeas proceedings, we would submit that

        18       is in fact not the case.  That is exactly what 7(a) is designed

        19       to protect.  That is why there is an exemption protecting

        20       information in an open investigation that could be used at

        21       trial.  And the fact that they have seen some of these

        22       materials is really irrelevant, because they have not seen all

        23       of them.  In fact, they asked for more in another case, in the

        24       habeas case, and specifically said no, we're only going to give

        25       you these particular materials.

D93TCENA

1            And I would just sort of emphasize again the examples

2       that we put forth in our brief, and that is that it is indeed

3       logical and plausible that given this particular case that

4       al Qahtani would try to argue that certain information that the

5       government might be trying to introduce at trial should be

6       suppressed based on his treatment or conditions of confinement,

7       and these particular videotapes would show him in his cell at

8       the very period in time which these interrogations were taking

9       place could be used as rebuttal evidence for impeachment

10      purposes and that it would be important.  It is exactly one of

11      the harms that 7(a) is designed to protect against to prevent

12      early access to those materials so as to prevent witnesses

13      changing their testimony, tailoring their testimony to avoid

14      impeachment.

15            I do want to just again -- counsel didn't mention this

16      particular exemption, but very briefly also mention exemption

17      6, which is also being relied upon by the government here to

18      withhold all the materials at issue.  The Second Circuit has

19      made clear that detainees at Guantanamo do have a privacy

20      interest.  They have privacy interest in their images.  What we

21      are talking about here are videos that include really intimate

22      and personal details of a detainee's life in his cell, and that

23      this is exactly the type of intrusive imagery that both the

24      exemption 6 is designed to protect against and also the Geneva

25      Conventions, and that the public interest, which we certainly

D93TCENA

|     |
|-----|
| 1 | acknowledge is real, is greatly outweighed in this case by the |
| 2 | individual's privacy interest in his own images. |
| 3 | I think the one other point that I would just mention |
| 4 | is again, very briefly, that with respect to the CIA's Glomar |
| 5 | response, we have also moved -- plaintiffs initially moved only |
| 6 | for partial summary judgment, we moved for summary judgment in |
| 7 | toto, including the CIA's Glomar response.  I'm happy to answer |
| 8 | any questions about that, I didn't want to repeat information |
| 9 | in our briefs. |
| 10 | Thank you, your Honor. |
| 11 | MR. LUSTBERG:  Sur sur surreply? |
| 12 | Got it.  Very briefly, I just wanted to address a |
| 13 | couple of points.  One point that the government makes is this |
| 14 | issue of the fact that pictures have unique power.  Obviously, |
| 15 | we don't disagree with that.  I mean it's been part of our |
| 16 | American lexicon that a picture is worth a thousand words.  But |
| 17 | the Court's job in this case is to look at these particular |
| 18 | images to see whether they satisfy these particular concerns, |
| 19 | and specifically whether these particular images give rise to |
| 20 | precisely the types of harms that the government is claiming |
| 21 | here. |
| 22 | It is true that generally pictures may have more |
| 23 | force, and perhaps even a greater ability to, let's say, foment |
| 24 | discord around the globe than a statement would be.  That may |
| 25 | be true, but that is not enough.  What your Honor has to do |

D93TCENA

1    here is to parse these particular images to see whether they

2    satisfy the legal standard involved.  It's not easy work, but,

3    as they say, that's what you're paid the big bucks to do.

4         Let me just say that in that regard unfortunately I

5    don't think you get a lot of help from the declarations that

6    the government has submitted.  And so Ms. Daughtry has cited to

7    you, for example, the Woods' declaration, and specifically

8    paragraph 24 where he says experience has shown that

9    photographs of detainee interactions with DOD personnel have

10   caused certain reactions in terms of, I guess, that people will

11   cooperate thereafter, that sort of thing.

12        When I say "I guess," I guess because there's very

13   little detail there.  I mean that is the type of conclusory

14   statement that we most respectfully submit -- I say

15   "respectfully" because it's wonderful to work with the

16   government in these cases, they do a great job, but that does

17   not -- that doesn't satisfy the legal standard and doesn't help

18   you to make your decision.

19        Likewise, when you look at the Horst declaration which

20   was submitted in the second round of declarations, Ms. Daughtry

21   points you to paragraph 12.  And I understand what is there in

22   paragraph 12, and talks about that previously published

23   photographs of U.S. forces interacting with detainees have

24   incited violence.  But I ask you to look at paragraph eleven,

25   which the context for paragraph twelve, and that's what I was

D93TCENA

 1    arguing about before, that the types of interactions that

 2    respectfully I think Admiral Horst was dealing with here were

 3    the types of really inflammatory interactions that are not what

 4    this case is about.

 5              You can look at the images for yourself and make that

 6    determination.  When you do, if you determine to do an in

 7    camera review, I think, although I don't know because I haven't

 8    seen them, but based upon the government's representation,

 9    which I take it at face value that they don't depict abuse, I

10    think that you will conclude that that standard is not met

11    either.

12              With regard to the Lietzau declaration, I did fail --

13    Ms. Daughtry is right, I failed to address the coded messages

14    argument.  And it is true that ICB court accepted that

15    argument.  I don't know precisely what the record that was made

16    there was or whether it included, for example, the information

17    that we have provided to you about the way that forced cell

18    extractions are done.  But what I know is this, that your

19    Honor's job today is to engage in a segregation analysis.  And

20    if you're concerned that the forced cell extraction videos

21    stand on different footing than the others, well, then so be

22    that.

23              But also the question is:  Are there parts of it that

24    would not possibly give rise to that concern, the concern of

25    coded messaging?  Well, the government says we would never know

D93TCENA

 1    what the coded messaging might be in the future for cell

 2    extractions, but if there is segregation that goes on, then

 3    detainees who are thinking about using this sort of interaction

 4    as code, as opposed to what they have to think about doing

 5    knowing that this kind of thing was going to happen, if they

 6    don't know when the segregation -- what segregation is going to

 7    take place, it certainly undermines the effectiveness of any

 8    such messaging.

 9            Finally, I just want to briefly address the issue

10    about that -- again, that under exemption 7(a) that the concern

11    is that providing this information will give rise to the

12    opportunity to create rebuttal-type evidence.  That's true of

13    any discovery in any case.  And so I think it's the

14    government's obligation in a case like this to put some meat on

15    the bones and to explain to your Honor in declarations what the

16    specific concern is that could be done and by whom.  It's the

17    government's job to show how this type of thing has happened

18    before with specificity so that your Honor can make a decision

19    on a record that is sufficiently complete to withstand judicial

20    review.  That is what is missing here.

21            My final point is with regard to privacy, because it's

22    true I didn't address that.  I think, again, we fully briefed

23    it in our papers, but the privacy concern is always a matter of

24    balancing on the one hand the public's right to know with all

25    the advantages for government accountability and transparency

D93TCENA

1    that are engendered thereby, and balance that against the

2    particular privacy concerns that one might have, whether under

3    the Geneva Conventions or otherwise.  And again, I ask you to

4    look at the Geneva Convention argument carefully in light of

5    its logic and plausibility given the government's prior conduct

6    with this particular detainee.

7              But in any event, the intrusion on privacy, even if we

8    assume Mr. al Qahtani's consent was not knowing, has to be

9    based upon the particular images involved.  So the question is:

10   Is there a particular privacy intrusion that comes about as a

11   result of looking at these videos, these particular 53 videos,

12   which is all -- because they claim privacy for all of them,

13   these particular mug shots, given all of what is out there in

14   the public sphere already, some of which is there as a result

15   of government action, not Mr. al Qahtani's image in particular,

16   but the images of detainees that are in the materials that we

17   provided to the Court.  Because the government says when you

18   look at those images, they're not identifiable of any detainee.

19   I don't know that.  There's some pretty clear images of

20   detainees in the images that the government made available to

21   the press and to the public over the years of people praying,

22   of people getting medical treatment, of people getting their

23   beards trimmed, those images are all in the materials that we

24   provided.  All of that has to be factored in so this balancing

25   is not something that is done in a vacuum but is based upon a

D93TCENA

1    particular factual record assembled on both sides in this case.

2    And as I said I think at the outset, the Court is blessed in

3    this case with having a pretty complete factual record based on

4    the submissions of the parties.

5         Beyond that, I would be happy to answer any questions

6    that your Honor would have.

7         THE COURT:  Do you have a need for the last word?

8         MS. DAUGHTRY:  I don't think so, your Honor, although

9    if you have questions in particular about other images that the

10   government has released, I'm happy to address them.

11        THE COURT:  I gather that plaintiff's counsel

12   accepts -- I gather from what he said that it's the

13   government's position that when you have released an image it

14   was not one that, in the government's view, could be identified

15   as a particular individual.

16        MS. DAUGHTRY:  That's exactly right, your Honor.  And

17   the exception to that is the policy of allowing the

18   International Committee for the Red Cross to take photographs

19   with the consent of detainees, and to provide those to the

20   detainee's families.  And I sort of add it is not insignificant

21   in this case that al Qahtani has not consented to have his

22   photograph taken by the ICRC given to his family.

23        And a final thing to clarify, all of those images that

24   are taken by the ICRC before they are released to the families

25   are in fact reviewed by the Department of Defense to ensure

D93TCENA

```
 1     that all the various harms that are outlined in our of all

 2     declarations would not come to pass through the release of

 3     those particular photographs.

 4            MR. LUSTBERG:  Well, if that's so, then that same sort

 5     of searching analysis ought to be done with regard to these

 6     particular images.

 7            THE COURT:  But here's the problem with your consent

 8     argument, apart from the fact that there is none in the record,

 9     is that even if there was a point in time when Mr. al Qahtani

10     was in better psychological shape, I'm assuming that what he

11     wanted -- assuming he gave the consent, what he wanted released

12     were images of him being tortured, not images, as the

13     government describes them, which don't show bad acts.  And then

14     I think there's a great difference in what a detainee would

15     want released, in sort of abstractly trying to get into the

16     mind of someone being held at Guantanamo, and I really don't --

17     I think for many reasons the consent argument just doesn't

18     work.

19            MR. LUSTBERG:  I wasn't -- I understand that's --

20     without conceding that point, because we think that there is

21     evidence of consent in this record, I understand the Court

22     discounts it.  I think that there are, without getting into the

23     details of conversations with Mr. al Qahtani, he certainly was

24     aware that there was not -- that the images at issue here would

25     not necessarily be of torture.  So that is just -- I mean
```

D93TCENA

1      that's -- I understand the Court's concern in that regard, but

2      either way, I don't think that -- what I'm saying is that that

3      is not the issue.  The issue is that the Court has to look at

4      the images that are here and see whether they will result in

5      the specific harms that the government has identified.  And

6      that really, at the end of the day, is the test.  They have

7      said that these images will cause these harms.  They have said

8      this Court must defer.  We say that that deference is embodied

9      in the logic and plausibility standard, and that when you apply

10     that standard to these images, you don't come up with the

11     conclusion that every single one of them in their entirety

12     should be withheld.  That is not a conclusion that could

13     logically or plausibly result from these particular concerns

14     irrespective of the consent issue.

15            MS. DAUGHTRY:  One very small point of clarification

16     is that the standard is not that the government must show that

17     it's logical and plausible that these harms must occur, the

18     standard is the government has to show that it is logical or

19     plausible that the harms could reasonably be expected to occur.

20     And that is, of course, a predictive assessment.

21            MR. LUSTBERG:  We accept that.

22            THE COURT:  OK.  Thank you very much.

23            MS. LaMORTE:  Thank you.

24            MS. DAUGHTRY:  Thank you, your Honor.

25                              o0o